UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

RONALD D. CORWIN, et al.,

                                        Plaintiffs,                    14-CV-1285 (SN)

            -against-                                          OPINION & ORDER

NYC BIKE SHARE, LLC, et al.,

                                        Defendants.

----------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge:

        On October 25, 2013, Ronald D. Corwin, an annual member of the Citi Bike bicycle

sharing program, was riding a Citi Bike in Midtown Manhattan. Upon passing through a Citi

Bike station located on East 56th Street and Madison Avenue, he collided with a concrete wheel

stop and violently hit his head against the cement. Alleging that the Citi Bike station in question

was improperly designed, installed, and maintained, Corwin brought claims for common-law and

gross negligence and professional negligence and malpractice, and Beth Blumenthal, Corwin's

wife, brought derivative claims for loss of her husband's services, society, companionship, and

consortium.[1]

        On February 27, 2014, Corwin brought claims against three defendants: the City of New

York ("City"), who planned, oversaw, and collaborated with the other defendants in

_____

[1] As Blumenthal's claims depend entirely on the viability of Corwin's causes of actions, the two claims
are referred to in shorthand as "Corwin's" throughout the text of the opinion. Where the Court grants
summary judgment or partial summary judgment to defendants on certain of Corwin's claims,
Blumenthal's claims are dismissed as well. Vega-Santana v. Nat'l R.R. Passenger Corp., 956 F. Supp. 2d
556, 562 (S.D.N.Y. 2013) ("Where the primary cause of action is dismissed on summary judgment, the
loss of consortium claim must be dismissed as well.").

implementing the Citi Bike program; NYC Bike Share, LLC ("NYCBS"), the company

operating the Citi Bike system, and the New York City Department of Transportation ("DOT").

ECF No. 1, Compl. On December 31, 2014, Corwin amended his complaint to remove the DOT

and add three additional defendants: Alta Bicycle Share, Inc. (now named "Motivate, Inc."),

which is NYCBS's parent company; and Alta Planning + Design ("APD") and Alta Planning +

Design + Architecture of New York ("APDNY"), a design company and its wholly-owned

subsidiary who drafted site plans for the Citi Bike system. ECF No. 27, First Am. Compl. After

conducting significant discovery, Corwin moved for and was granted leave to amend his

complaint to join two additional defendants, Metro Express Services, Inc. ("Metro Express") and

Sealcoat USA, Inc. ("Sealcoat"), both contractors who are alleged to have participated, in

violation of the station's design plan, in the installation of the wheel stop struck by Corwin. ECF

No. 192, Second Am. Compl.

　　　All of the defendants move separately for summary judgment on a variety of grounds.[2]

All defendants argue that the condition was open and obvious and that Corwin's negligence

claims generally fail as a matter of law. The City, NYCBS, and APD argue that Corwin's

common-law negligence claims were released by the Bicycle Rental, Liability Waiver, and

Release Agreement ("Release Agreement") that he had to sign as a condition of Citi Bike

membership, and that they are barred by the doctrine of primary assumption of the risk. APD,

Metro Express and Sealcoat argue that, as third-party entities in a contractual relationship with

Corwin, they owed him no duty of care. APD additionally argues that the Citi Bike station's

deviation from the design is an absolute bar to liability, and that there was no causation between

---

[2] As their liability is exclusively a product of being a parent company of a wholly owned subsidiary, Alta Bicycle Share, Inc./Motivate, Inc. moves for summary judgment together with NYCBS, and APD moves together with APDNY. For the sake of brevity, these motions are referred to as the "NYCBS" and "APD" motions, respectively.

its design and Corwin's injury. The City also contends that Corwin's claims are barred due to the doctrine of qualified immunity and its lack of written notice of the condition pursuant to a municipal notice statute.

For his part, Corwin moves for partial summary judgment on two issues. First, he argues that the Release Agreement is unenforceable on numerous statutory, public policy, and contract formation grounds, and that defendants' affirmative defenses relying on the Agreement should be dismissed as a matter of law. Second, he contends that the fact that he was not wearing a helmet at the time of the accident is irrelevant as a matter of law to issues of assumption of the risk, comparative fault, or failure to mitigate damages, and therefore defendants' affirmative defenses relying on this argument should be dismissed.

For the following reasons, the cross-motions for summary judgment are GRANTED in part and DENIED in part. Corwin's motion to dismiss defendants' affirmative defenses relying on the Release Agreement is DENIED as to NYCBS; the Agreement is enforceable as a matter of law as to NYCBS. Corwin's motion to dismiss the affirmative defenses relating to the Release Agreement is GRANTED as to the City because a contractual waiver of the City's non-delegable duty to maintain public thoroughfares would be contrary to public policy. Corwin's motion to dismiss defendants' affirmative defenses relating to his non-use of a helmet is GRANTED in part; defendants may not argue that this is relevant to questions of liability to establish comparative negligence or assumption of the risk, but if liability is found, may argue that Corwin failed to mitigate damages. The City's motion for summary judgment is DENIED; as stated above, the Release Agreement is ineffective to waive Corwin's claims at to the City, and the City has not demonstrated its entitlement to judgment as a matter of law on qualified immunity, notice, or other grounds. NYCBS's motion for summary judgment is GRANTED in part;

because the Court finds that the Release Agreement is enforceable as to NYCBS, Corwin's common-law negligence claims are barred, but he may still maintain gross negligence claims. APD's motion for summary judgment is GRANTED because APD and APDNY did not owe any duty to Corwin. Accordingly, APD and APDNY are dismissed from this case. Metro Express and Sealcoat's motions for summary judgment are DENIED because a genuine dispute of material fact exists as to whether they owed Corwin a duty of care under applicable New York law.

## BACKGROUND

### I.     History of the Citi Bike Program

Beginning in 2009, the City of New York began to study the feasibility of installing a bike share system in and around City streets, located in curbside parking lanes, on sidewalks, and near public spaces and parks. ECF No. 293, City's Rule 56.1 Statement ("City St.") ¶ 2. On April 10, 2012, the City and NYCBS entered into an agreement for the design, construction, operation, maintenance, and publicizing of "Citi Bike," a network of self-service bike share stations with publicly available bicycles. ECF No. 310, Corwin's Rule 56.1 Statement ("Corwin St.") ¶ 2. The system became operational in May 2013. City St. ¶ 5; ECF No. 317, NYCBS's Rule 56.1 Statement ("NYCBS St.") ¶ 1.

The City-NYCBS contract required NYCBS to design and install on-street bike parking stations "with appropriate protections and markings from adjacent parking and moving traffic. . . . [including] non-permanent bollards and paint markings." City St. ¶ 31. The contract also noted that all protections and markings were to be preapproved by the DOT's Division of Traffic. Id.

The design for the Citi Bike stations was modeled in part on the City's previous experience with "bike corrals," which were also placed in parking lanes and were designed by

the DOT's Highway Design Unit and Pedestrian and Bicycle Group. City St. ¶¶ 41–42. These corrals had many elements that would ultimately be integrated into the Citi Bike stations, such as wheel stops, paint marking and bollards. Id. ¶ 42.

At the time that the NYCBS contract was signed with the City, APD and APDNY were subsidiaries of Alta Bicycle Share, Inc., NYCBS's parent company. Id. ¶ 48. APD assembled a team of architects, engineers, and designers to collaborate with the City on station design. Id. ¶¶ 49–50. Using a bike corral on Smith and Sackett Street as an exemplar, the APD and the City developed "Station Siting Guidelines" that included the use of unpainted, concrete wheel stops. Id. ¶¶ 51–57. Though the City originally approved the use of rubber wheel stops, it instructed NYCBS to replace them with concrete wheel stops because the rubber stops were not sufficiently durable. Id. ¶ 96. The wheel stops were considered by APD to be necessary to prevent damage to the station equipment by encroaching vehicles. Id. ¶ 58.

The final design for Citi Bike stations situated in parking lanes included white thermoplastic markings and three-foot tall, reflective, flexible delineators on or near the markings. Wheel stops were to be used in the stations to protect the station equipment. Id. ¶¶ 64–66. These elements were collectively referred to as "street treatment." Id. ¶ 81. While NYCBS installed the station equipment directly, it contracted the installation of street treatment to Metro Express, allegedly without the City's awareness. Id. ¶ 83. MetroExpress, in turn, subcontracted this work to another entity, Sealcoat, allegedly without the awareness of either the City or NYCBS. Id. ¶¶ 85–86.

The City considered, but chose not to mandate that Citi Bike riders wear helmets. It also did not provide helmets for Citi Bike riders on demand. Id. ¶ 8. The City came to this conclusion because (a) New York law did not mandate that adult cyclists wear helmets and it did not want to

promote different standards for Citi Bike riders and other cyclists as a matter of public policy; (b) it believed, based on studies conducted in other cities, that mandatory helmet laws decreased bicycle ridership in general and bike share system use in particular; (c) certain statistics indicated that mandatory helmet laws actually decreased cyclist safety by reducing the number of cyclists on the road; and (d) research suggested that helmeted cyclists tended to ride more recklessly than those without helmets. Id. ¶¶ 9–16; Corwin St. ¶ 10. The City also specifically evaluated the feasibility and wisdom of instituting a public helmet distribution system, but ultimately concluded that there were numerous logistical barriers to such a system, such as hygiene, the fact that the structural integrity of helmets would be compromised if they were involved in an accident, and lack of proper fitting and sizing capabilities. City St. ¶¶ 18–22. The City further considered what it viewed as unfavorable experiences with such systems in Seattle, Boston, and Melbourne, Australia. Id. ¶ 25. The City did, however, provide annual Citi Bike members with discounted vouchers for helmets and expanded its helmet giveaway and fitting programs. Id. ¶¶ 27–28.

## II. Design and Installation of Citi Bike Station on East 56th Street and Madison Avenue

The station where Ronald Corwin's accident occurred was located at the intersection of East 56th Street and Madison Avenue. Id. ¶ 98. The City issued a permit to NYCBS for the installation of the station on July 22, 2013, and the station equipment was installed on July 30, 2013. Id. ¶¶ 103–04. The City approved APD's design drawing of the station on August 6, 2013, including all street treatment. Id. ¶ 100. The approved design had only one wheel stop at the west end of the station, no thermoplastic striping within the boxes at the ends of the station, a station width of eight feet, and a total of six delineators. ECF No. 301, Alta Planning and Design Rule

56.1 Statement ("APD St.") ¶ 30. None of the site plan drawings, including the approved drawing, contained a wheel stop at the east end of the station closest to Madison Avenue.

The street treatment at the East 56th Street and Madison Avenue station was installed on or about October 22, 2013. APD St. ¶ 31. Notwithstanding its absence on the approved plan, a wheel stop was installed at the east end of the station as well, and the station did not conform to the approved plan in several other respects: the station footprint was made wider by the installation of thermoplastic striping more than eight feet in width, additional delineators were added, and cross-hatched striping was installed on either end of the station underneath the wheel stops. Id. ¶ 34. Though this is disputed by the defendants, Corwin argues that the wider footprint is relevant because, as it provided less clearance between the edge of the station and moving traffic, it would have encouraged a cyclist to use the station itself as a temporary riding lane. ECF No. 335, Decl. of Pl.'s Exp. James E. Green, ¶¶ 56–58. The City denies approving the installation of a second wheel stop at this site, and claims that its records do not show that it had written notice regarding the additional wheel stop. City St. ¶¶ 102, 106, 108.

The entity responsible for installing the wheel stop is contested; Metro Express and Sealcoat contend that an October 18, 2013 email from NYCBS informed them only of the need for repairs to the station, and that after Sealcoat representative Ryan Landeck visited the station on October 22, 2013, he reported that there was nothing to be done at the station in a October 24, 2013 email to Metro Express. ECF No. 368-3, Landeck Depo. at 41, 51; ECF No. 368-4, Landeck Oct. 24, 2013 E-mail. Metro Express further contends that the City had often instructed NYCBS, who in turn had instructed Metro Express to install "Supplemental Street Treatments" not depicted on station plans, and that such supplemental installations included second wheel stops. ECF No. 368-8, May 17, 2013 Email; ECF No. 335-20, Strasser 06/28/16 Depo. at 48–51.

Metro Express alleges that on July 17, 2013, and October 9, 2013, it was specifically ordered by NYCBS to install a second wheel stop not depicted on station plans at three stations around the network.  ECF 368-10; 368-11; 368-12; 368-13; 368-14. There is no direct evidence in the record, however, that such a request was ever issued for the East 56th Street and Madison Avenue station.

### III.    Ronald Corwin's Citi Bike Membership and Release Agreement

Ronald Corwin signed up online for an annual Citi Bike membership on June 25, 2013. Corwin St. ¶ 15. Corwin does not remember the details of the process, and did not recall clicking on or reading the Bicycle Rental, Liability Waiver, and Release Agreement as a condition of membership. Id. ¶ 18. Nevertheless, he did admit in deposition testimony that "I don't deny that I signed whatever it is I had to sign in order to get my Citi Bike Pass." NYCBS St. ¶ 21. NYCBS has not, however, produced a version of the Agreement dated contemporaneously to Corwin's registration, or Corwin's actual electronic signature. Corwin St. ¶ 22.

While the applicability and enforceability of the Release Agreement is disputed by the parties, there is no serious dispute as to its content. NYCBS has produced an agreement dated July 25, 2014, and Justin Ginsburgh, former General Manager of NYCBS and current Vice President of Business Development of its parent company Motivate Inc./Alta Bicycle Share, testified that this agreement was active on the date that Corwin became a member. ECF No. 316, Ginsburgh Decl. ¶¶ 10; ECF No. 371-3, Ginsburgh Supp. Decl. ¶¶ 2–3; ECF 316-1, Bicycle Rental, Liability Waiver, and Release Agreement ("Release Agreement"). Ginsburgh attested that it would be impossible to become a Citi Bike member without first being shown the Release Agreement in a scrollable text box and then clicking a box stating "I certify that I am the

Member, I am 18 years old or over, and I have read and agree to the conditions set forth in (sic) User Agreement." NYCBS St. ¶¶ 17–18; City St. ¶¶ 118–20.

The Release Agreement contains several provisions, which are reproduced below in relevant part:

**Section 6. Releases:**

In exchange for You being allowed to use any of the Services, Citi Bike bicycles, Stations, Bike Docks, or related information, You . . . do hereby fully and forever release and discharge all Released Persons for all Claims that You have or may have against any Released Person, except for Claims caused by the Released Person's gross negligence or willful misconduct. Such releases are intended to be general and complete releases of all Claims. The Released Persons may plead such releases as a complete and sufficient defense to any Claim, as intended 3rd beneficiaries of such releases.

"Claims" is defined in the Release Agreement as "any and all claims, injuries, demands, liabilities, disputes, causes of action (including statutory, contract, negligence, or other tort theories), proceedings [or] damages that arise from or relate to (a) any of the Services, including any of the Citi Bike bicycles, Stations, Bike Docks, or related information . . . ." "Released Persons" is defined in the Agreement, as relevant, as including: "(i) NYCBS and all of its owners, managers, affiliates, employees, agents, representatives, successors, and assigns [and] (ii) the City of New York."

**Section 7. Disclaimers:**

You do hereby acknowledge and agree that your use of any of the services, Citi Bike bicycles, stations, bike docks, or releated [sic] information, is at your sole risk. . . . All of the services, Citi Bike bicycles, stations, bike docks, or related information are provided "as is" and "as available" (and you rely on them solely at your own risk). . . . You assume full responsibility and risk of loss for using any of the services, Citi Bike bicycles, stations, bike docks, or releated [sic] information, and NYCBS and all other released persons are not liable for any claim attributable to any of the foregoing.

**Section 8. Limited Liability:**

You do hereby acknowledge and agree that, except as may otherwise be limited by New York General Obligation Law Section 5-326, NYCBS and all other released persons are not responsible or liable for any claim, including those that arise out of or relate to (A) any risk, danger or hazard described in the Agreement, (B) Your use of or inability to use, any of the services, Citi Bike bicycles, stations, bike docks, or releated (sic) information, (C) your breach of this agreement or your violation of any law, (D) any negligence, misconduct, or other action or inaction by you, (E) your failure to wear a bicycles helmet while using Citi Bike bicycle, or (F) any negligence, misconduct, or other action or inaction of any third party. You do hereby waive all claims with respect to any of the foregoing, including those based in contract, tort (including negligence), statutory, or other grounds, even if NYCBS or any of the other released persons has been advised of the possibility of such claims. The total liability of NYCBS and all other released persons for all claims, including those based in contract, tort (including negligence), statutory, or other grounds, is limited to the sum of $100.

**Section 9. Assumption of Risk by Member:**

Member agrees that riding a Citi Bike bicycle involves many obvious and not-so-obvious risks, dangers, and hazards, which may result in injury or death to Member or others, as well as damage to property, and that such risks, dangers, and hazards cannot always be predicted or avoided. Member agrees that such risks, dangers, and hazards are Member's sole responsibility.

## IV.    Ronald Corwin's Ride and Accident

At 10:57 a.m. on October 25, 2013, Ronald Corwin picked up a Citi Bike at a station located on the southeastern corner of 6th Avenue and East 56th Street. From there, he travelled in the direction of Grand Central Station. Corwin St. ¶ 25; NYCBS St. ¶ 32. He was not wearing a helmet. Corwin St. ¶ 26; City St. ¶ 137. Corwin proceeded eastbound in the traffic lane on East 56th Street, with vehicular traffic proceeding to his left. NYCBS St. ¶ 34. Because Corwin claimed to have been "under pressure" from the vehicular traffic, he turned into the Citi Bike station on East 56th Street and Madison Avenue. Id. ¶ 35. The station area was indicated by a perimeter of 4 inch white thermoplastic stripes on the asphalt roadway, and three foot tall white flexible delineators with gray reflective tape spaced approximately every 10 feet along the

thermoplastic striping. Id. ¶ 36. At either end of the station, unpainted concrete wheel stops measuring 5 feet, 10.5 inches long by five inches high, were installed on the roadway. Id. ¶ 40. These wheel stops were framed by a box of white thermoplastic striping with diagonal cross-hatching, staked out by three-foot tall flexible delineators. Id. ¶ 41. While he was travelling within the station "envelope," the front wheel of Corwin's Citi Bike hit the concrete wheel stop installed near the crosswalk at the Madison Avenue end of the station, causing him to crash onto the pavement and sustain serious injury. Corwin St. ¶ 26.

## ANALYSIS

### I.     Standard of Review

Under Federal Rule of Civil Procedure 56(a), the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The moving party bears the initial burden of establishing that there are no material facts in dispute and must provide "affirmative evidence" from which a factfinder could return a verdict in its favor. Id. at 257. Then "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., LP, 22 F.3d 1219, 1224 (2d Cir. 1994).

In determining whether summary judgment is appropriate, the court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. See Scott v. Harris, 550 U.S. 372, 378 (2007). Summary judgment is improper if "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. . . ." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). To create a disputed fact sufficient to deny summary judgment, the non-moving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible. . . ." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). Instead, the response "must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation and internal quotation marks omitted).

## II.     Waiver and Release

It is undisputed that in order to become a member of Citi Bike, Corwin would have been required to assent to a release of claims as set forth in the Bicycle Rental, Liability Waiver, and Release Agreement ("Release Agreement"). This Agreement covered "any and all claims, injuries, demands, liabilities, causes of action (including statutory, contract, negligence, or other tort theories) . . . that arise from or relate to (a) any of the Services, including any of the Citi Bike bicycles, Stations, Bike Docks, or related information or (b) Your use of any of the foregoing." It required Corwin to "discharge all Released Persons for all Claims that You have or may have against any Released Person, except for Claims caused by the Released Person's gross negligence or willful misconduct." ECF 316-1, Release Agreement. As relevant here, the Agreement expressly included NYCBS and the City of New York, as well as all of NYCBS's "owners, managers, affiliates, employees, agents, representatives, successors, and assigns" within the definition of "Released Persons." Id.

Corwin moves for partial summary judgment to strike the City and NYCBS's affirmative defenses based on the Release Agreement, arguing that the Agreement is ambiguous, contrary to law, and/or void as a matter of public policy. For their part, the City and NYCBS move for summary judgment arguing that Corwin's negligence claims against them are waived by the release, with the exception of those sounding in gross negligence. Though it is not expressly named in the release, APD also argues that the claims against it are released because of its relationship to NYCBS.

As a threshold issue, the Court considers if there is a genuine dispute as to whether Corwin signed a release and, if so, its scope. Corwin argues that because defendants have failed to produce an actual copy of the Release Agreement with his electronic signature, or a copy of the Agreement as it existed when he became an annual member, defendants cannot demonstrate that he signed the waiver at all. Defendants have produced a declaration from Justin Ginsburgh, former General Manager of NYCBS and current Vice President of Business Development of its parent company Motivate Inc./Alta Bicycle Share, that describes the membership process and states that Corwin would have had to agree to the terms of the Agreement in order to become a member. ECF No. 316, Ginsburgh Decl., ¶¶ 7–9. Ginsburgh also declares that the Release Agreement appended to his declaration, dated July 15, 2014, was a "true and complete copy of the User Agreement that was in effect in May 2013 when Mr. Corwin became a Citi Bike member."[3] Id. at ¶ 10; ECF No. 371-3, Ginsburgh Supp. Decl., ¶¶ 2–3 ("The User Agreement . . . was fully in effect when plaintiff Ronald Corwin obtained his Citi Bike membership on June 25, 2013."). Ginsburgh had previously noted in deposition testimony, however, that he was no longer in his General Manager position as of April 1, 2014, and therefore "[didn't] know if any

---

[3] The first Ginsburgh Declaration inaccurately references Corwin becoming a Citi Bike member in May 2013; in fact, Corwin became a Citi Bike member on June 25, 2013.

changes occurred [to the membership signup] after that." ECF No. 360-6, Justin Ginsburgh

Depo. at 463. Corwin stated in deposition testimony that he completed the membership

application and "signed whatever it is [he] had to sign in order to get [his] Citi Bike pass," but

did not remember the contents of the Agreement or whether he had read it. ECF No. 315-4,

Ronald Corwin 9/9/2015 Depo. at 195.

Corwin has failed to "set forth specific facts demonstrating that there is a genuine issue

for trial," Wright, 554 F.3d at 266, as to the existence and scope of the Agreement. Defendants

have produced declaration testimony from Justin Ginsburgh, and Corwin has challenged the

credibility of those statements. He has not, however, despite extensive discovery, introduced any

evidence that there was an agreement with different terms in effect when Corwin became a Citi

Bike member, or even any evidence that raises doubt as to whether the Agreement provided by

defendants was in effect. Nor has Corwin provided any evidence that he was somehow able to

sign up for his Citi Bike membership without following the process described by Ginsburgh,

which required him to manifest assent to the Release Agreement. Therefore, Corwin has failed to

raise a genuine dispute of material fact regarding the existence of a contract between the parties.

Accordingly, whether or not Corwin's claims are barred by the Release Agreement shall depend

solely on the effectiveness of Corwin's assent under the circumstances, and the enforceability of

the waiver provisions as to the various defendants.

### A.      Unconscionability Analysis in Online "Clickwrap" Contracts

The first question for the Court's consideration is whether, absent any overarching

questions of statutory or common law public policy, the contract is enforceable on its own terms

or whether, as Corwin argues, it is an "unconscionable and unenforceable contract of adhesion."

A contract or clause is unconscionable when it was "both procedurally and substantively

unconscionable when made—i.e., some showing of an absence of meaningful choice on the part

of one of the parties together with contract terms which are unreasonably favorable to the other

party." Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1, 10 (1988) (internal quotation

marks and citations omitted); see also Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc., 191 F.3d

198, 207 (2d Cir. 1999).

 The parties agree that the contract in question is a "clickwrap" agreement. Such an

agreement requires the user to take an affirmative action, usually, the clicking of a box that states

that he or she has read and agrees to the terms of service. "[U]nder a clickwrap arrangement,

potential licensees are presented with the proposed license terms and forced to expressly and

unambiguously manifest either assent or rejection prior to being given access to the product."

Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 429 (2d Cir. 2004). Clickwrap agreements are

"more readily enforceable [than online contracts that do not require the user to take an

affirmative action], since they 'permit courts to infer that the user was at least on inquiry notice

of the terms of the agreement, and has outwardly manifested consent by clicking a box.'" Meyer

v. Kalanick, No. 15-CV-9796 (JSR), 2016 WL 4073071, at *6 (S.D.N.Y. July 29, 2016) (citing

Cullinane v. Uber Techs., Inc., No. 14-CV-14750 (DPW), 2016 WL 3751652, at *6 (D. Mass.

July 11, 2016)). While the Court of Appeals has not categorically ruled on the issue, it has

strongly implied that such contracts are presumptively enforceable. See, e.g., Starkey v. G

Adventures, Inc., 796 F.3d 193, 197 (2d Cir. 2015) (noting that case would have been "simpler to

resolve had [defendant] used a 'clickwrap' mechanism to provide reasonable notice and to obtain

[plaintiff's] assent"). Accordingly, most lower courts have enforced such contracts, absent

extraordinary circumstances. See Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 397 (E.D.N.Y.

2015) (collecting cases); Centrifugal Force, Inc. v. Softnet Commc'n, Inc., No. 08-CV-5463

(CM), 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011) ("In New York, clickwrap agreements are valid and enforceable contracts.").

Nevertheless, a user's clicking of a box is not, without more, sufficient to signal their assent to any contract term. The touchstone in most courts' analysis of the enforceability of clickwrap contracts turns on whether the website provided "reasonably conspicuous notice that [users] are about to bind themselves to contract terms." Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 32 (2d Cir. 2002) (Sotomayor, J.). In many cases, this becomes a fact-intensive inquiry because "electronic agreements fall along a spectrum in the degree to which they provide notice, and it is difficult to draw bright-line rules because each user interface differs from others in distinctive ways." Meyer, 2016 WL 4073071, at *8.

In Berkson, Judge Weinstein of the Eastern District of New York, surveying cases from federal courts nationwide, provided a useful set of parameters to guide this inquiry. First, terms of use should not be enforced if a reasonably prudent user would not have had at the very least inquiry notice of the terms of the agreement. Berkson, 97 F. Supp. 3d at 401 (citing Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1177 (9th Cir. 2014)). Second, terms should be enforced when a user is encouraged by the design and content of the website and the agreement's webpage to examine the terms, such as when they are clearly available through hyperlink. Id. (citing Ticketmaster Corp. v. Tickets.Com, Inc., No. 99-CV-7654 (HLH), 2003 WL 21406289, at *2 (C.D. Cal. Mar. 7, 2003)). Conversely, terms should not be enforced when they are "buried at the bottom of a webpage" or "tucked away in obscure corners." Id. at 401–02 (collecting cases refusing to enforce such agreements). Special attention should be paid to whether the site design brought the consumer's attention to "material terms that would alter what a reasonable consumer would understand to be her default rights when initiating an online [transaction]," and, in

appropriate cases, such terms should not be enforced even when the contract is otherwise

enforceable. Id. at 402; see also Meyer, 2016 WL 4073071, at *10 ("When contractual terms as

significant as . . . the right to sue in court are accessible only via a small and distant hyperlink . . .

with text about agreement thereto presented even more obscurely, there is a genuine risk that a

fundamental principle of contract formation will be left in the dust: the requirement for a

manifestation of mutual assent.") (internal quotation marks and citation omitted). Broad

exculpatory clauses waiving liability for negligence would certainly qualify as material terms

that alter a contracting party's commonly-understood default rights.

In this case, NYCBS represents that "before the prospective member can proceed to pay

for the membership, each person is shown the . . . 'User Agreement.' The User Agreement is

displayed on the page in its own scrollable text box, which may also be opened in a new window

for ease of viewing and printing." ECF No. 316, Ginsburgh Decl., at ¶ 7. The "continue" button

allowing Corwin to provide his payment information would not activate until Corwin clicked on

a statement reading "I certify that I am the Member, I am 18 years old or over, and I have read

and agree to the conditions set forth in [sic] User Agreement." Id. at ¶¶ 8–9; Release Agreement,

ECF No. 316-1 at 56. The Release Agreement itself, roughly 10 pages in length, contained a

bold-faced and underlined section in larger font titled "Releases; Disclaimers; Limited Liability;

Assumption of the Risk." The text of the sections in question are in normal-sized font. Though

Corwin stated that he had no specific recollection of reading and signing the Release Agreement,

he did admit "I don't deny that I signed whatever it is I had to sign in order to get my Citi Bike

pass." ECF No. 315-4, Ronald Corwin 9/9/2015 Depo. at 195.

Applying the considerations in Berkson, the Release Agreement is enforceable. The full

scrollable text of the agreement was available on the same page a user must utilize to register,

requiring no clicking of hyperlinks, and the user cannot continue to input his payment

information until he signals assent to the agreement by taking the affirmative step of clicking a

box. While it is possible to imagine clearer signaling of the importance of the waiver provisions

to an unwary or unsophisticated consumer, the terms are not hidden or buried in an obscure part

of the website, but rather are in plain view. Accordingly, the Release Agreement is not

unconscionable, and Corwin is not entitled to strike the City and NYCBS's affirmative defenses

on this basis.

### B.      Ambiguity

To be enforceable, an exculpatory agreement must be stated in clear, coherent,

unambiguous language and expressly release a defendant from ordinary claims. See, e.g.,

Spancake v. Aggressor Fleet Ltd., No. 91-CV-5628 (DLC), 1995 WL 322148, at *4 (S.D.N.Y.

May 26, 1995). Corwin argues that the waiver is unenforceable due to ambiguity, finding a

conflict between Section 8 ("Limited Liability"), which purports to release defendants from

claims arising from riders' "failure to wear a bicycle helmet while using a Citi Bike bicycle," and

Section 5, which does not list failing to wear a helmet as one of 11 "Prohibited Acts." ECF 316-

1, Release Agreement.

There is plainly no contradiction between Section 5 and Section 8. Section 5 lists

actions, such as defacing a Citi Bike bicycle, transferring a bicycle to a non-member, or using a

cellphone while riding that could presumably lead to contractual consequences for the member.

Not wearing a helmet is not prohibited, which is also consistent with New York law allowing

adult cyclists to ride without a helmet. See infra Part III.

Section 8 instead provides a non-exhaustive list of circumstances for which the contract

seeks to limit liability. On its face, the fact that this list is not identical to that in Section 5

presents no contradiction, as they are presented for entirely different purposes.[4] Moreover, the

examples in Section 8 are meant only to illustrate *some* of the circumstances under which

liability is to be limited; the section refers to limited liability for "*any* claim, *including* those that

arise out of or relate to . . . your failure to wear a bicycle helmet while using Citi Bike bicycle."

Id. (emphasis added).

 As such, the Release Agreement is not void due to ambiguity.

 **C.**  **Unenforceability on Public Policy Grounds**

 New York law "frowns upon contracts intended to exculpate a party from the

consequences of his own negligence and though, with certain exceptions, they are enforceable,

such agreements are subject to close judicial scrutiny." Gross v. Sweet, 49 N.Y.2d 102, 106

(1979). Therefore, an exculpatory contract must express "in unequivocal terms the intention of

the parties to relieve a defendant of liability for the defendant's negligence." Lago v. Krollage,

78 N.Y.2d 95, 100 (1991); Roane v. Greenwich Swim Comm., 330 F. Supp. 2d 306, 321

(S.D.N.Y. 2004) (finding that appearance of the actual word "negligence" was significant in

determining whether exculpatory contract was to be enforced). But "even an agreement that

clearly and unambiguously attempts to exempt a party only from liability for ordinary negligence

will not be enforced . . . if it is found to violate public policy . . . ." Ash v. New York Univ.

Dental Ctr., 164 A.D.2d 366, 369 (1st Dep't 1990).

 Public policy "is to be ascertained by reference to the laws and legal precedents and not

from general considerations of supposed public interests." Lubov v. Horing & Welikson, P.C.,

---

[4] On wholly separate grounds, in Part III of its opinion, the Court grants Corwin summary judgment on
Defendants' affirmative defenses that Corwin's failure to wear a bicycle helmet relieves them of liability
because as a matter of New York law, the failure to wear a helmet goes only to the question of mitigation
of damages. This does not, however, affect the clear and unambiguous nature of the waiver provisions.

72 A.D.3d 752, 753 (2d Dep't 2010) (citation omitted); see also Lewis v. N.Y. State Dep't of Civil Serv., 60 A.D.3d 216, 222 (3d Dep't 2009) (defining New York public policy as "the law of the [s]tate, whether found in the Constitution, the statutes or judicial records") (citation omitted). Parties may, however, "agree to give up statutory or constitutional rights in a contract, as long as public policy is not violated." J. D'Addario & Co., Inc. v. Embassy Indus., Inc., 20 N.Y.3d 113, 119 (2012).

Corwin argues that the Release Agreement violates three sources of public policy—New York City Administrative Code § 19-110, which provides that municipal permit holders may be held liable for their own negligence, New York General Obligations Law § 5-326, which invalidates exculpatory clauses in agreements with operators of recreational facilities, and the City's non-delegable common-law duty to maintain the public streets.

### i.       New York City Administrative Code § 19-110

New York City Administrative Code ("NYCAC") § 19-110 reads:

> Liability for damage. In all cases where any person shall engage in any activity for which a permit is required pursuant to [the subchapter concerning streets and sidewalks], such person shall be liable for any damage which may be occasioned to persons, animals, or property by reason of negligence in any manner connected with the work.

Corwin argues that this statute represents a "public policy" intended to provide a "statutory remedy" against all persons who negligently perform work subject to the issuance of a permit. He notes that there was no explicit reference to waiving any rights or remedies under NYCAC § 19-110 in the Release Agreement, but even if there were, such a waiver would be unenforceable because of an alleged public policy to protect the public and ensure a remedy against any person acting under a permit to individuals injured by their negligence.

Case law regarding § 19-110 (and its predecessor provision, § 19-107) is sparse, and no court has held that § 19-110 provides a statutory right at all—much less a non-waivable statutory right elevated to the status of public policy. Instead, the available case law deals exclusively with whether the statute can be invoked as a basis for the City to seek indemnification, as opposed to contribution, from a negligent municipal contractor. See City of New York v. Consol. Edison Co., 198 A.D.2d 31, 31–32 (1st Dep't 1993) (finding that statute did not provide a basis for indemnification, but rather only that a contractor was responsible for its own negligence); Petrucci v. City of New York, 167 A.D.2d 29, 34 (1st Dep't 1991) (concluding that statute did not provide a basis for indemnification of the City, but only an "intent to render the contractor responsible for those damages actually caused to injured third parties or property by its own negligence or carelessness"); Libardi v. City of New York, 201 A.D.2d 539, 540–41 (2d Dep't 1994) (same).

This limited case law appears to do no more than clarify, in line with common-law negligence principles, that the City may seek contribution for damages to third parties occasioned by a negligent contractor or property owner conducting work pursuant to a municipal permit. It is plainly insufficient to constitute an overarching public policy guaranteeing Corwin the right to sue any contractor notwithstanding a contractual waiver. Indeed, Corwin has cited no case in which the statute was interpreted to provide a plaintiff a private right of action or a "statutory remedy" differing in any way from a common-law negligence claim. Accordingly, NYCAC § 19-110 cannot serve as a basis for invalidating the Release Agreement.

ii.        New York General Obligations Law § 5-326

New York has a statutory restriction that invalidates exculpatory clauses or agreements between users and owners and operators of recreational facilities. N.Y. General Obligations Law ("GOL") § 5-326 provides:

> Every covenant, agreement or understanding in or in connection with, or collateral to, any contract, membership application, ticket of admission or similar writing, entered into between the owner or operator of any pool, gymnasium, place of amusement or recreation, or similar establishment and the user of such facilities, pursuant to which such owner or operator receives a fee or other compensation for the use of such facilities, which exempts the said owner or operator from liability for damages caused by or resulting from the negligence of the owner, operator or person in charge of such establishment, or their agents, servants or employees, shall be deemed to be void as against public policy and wholly unenforceable.

The Release Agreement explicitly refers to this statute, noting that Released Persons are not "responsible or liable . . . except as may otherwise be limited by New York General Obligations Law 5-326." ECF No. 316-1.

In order for GOL § 5-326 to apply, the plain text of the statute indicates that the agreement in question must (1) be made between a user and an owner or operator of a "place of amusement or recreation" or "similar establishment," and (2) a fee or other compensation must be paid for "use" of a "facility" covered by the statute. Courts that have considered situations where equipment was rented and taken out of the control of the facility owner or operator have additionally considered whether the owner or operator exercised a substantial level of control over the environment in which the recreational activity takes place. See, e.g., Dumez v. Harbor Jet Ski, Inc., 117 Misc. 2d 249, 250 (Sup. Ct. Niagara Cty. 1981).

Corwin argues that the Citi Bike program was primarily, or at the very least, substantially, a "recreational" program, and that the defendants' business plan presupposed a significant number of daily and recreational users. He cites to a state court proceeding in which a

neighborhood association challenged the installation of a Citi Bike station in a public park on the grounds that it was purely a commuter program. There, the City argued and the court held that the program fulfilled a valid recreational purpose. Friends of Petrosino Square v. Sadik-Khan, 42 Misc. 3d 226 (Sup. Ct. N.Y. Cty. 2013), aff'd, 126 A.D.3d 470 (1st Dep't 2015). Therefore, according to Corwin, because the Citi Bike rental station where the accident occurred was a "place of recreation," and he paid a fee to access the facility in the form of his annual membership, GOL § 5-326 operates to invalidate the exculpatory clause in the contract.[5]

While the parties may dispute whether Corwin's fateful Citi Bike ride was "recreational" in character, it is clear that the applicability of GOL § 5-326 cannot possibly turn on whether the given individual was using the bicycle recreationally or for commuting purposes. Defendants, moreover, argue that the statute does not apply because the membership fee does not entitle the user access or use of any physical facility; the fee is solely for the rental of a bike, while any individual is free to traverse the Citi Bike stations or New York City streets.

Several New York courts have held that GOL § 5-326 does not apply to accidents occurring on publicly accessible roadways, trails, or fields. See Deutsch v. Woodridge Segway, LLC, 117 A.D.3d 776, 777 (2d Dep't 2014) (statute not applied to plaintiff who rented a Segway vehicle and was taken on defendant-guided tour of muddy public trail "because the fee she paid to the defendant was for the rental of the Segway vehicle, and was not an admission fee for the use of the public trail over which the tour was conducted"); Brookner v. N.Y. Roadrunners Club, Inc., 51 A.D.3d 841, 842 (2d Dep't 2008) (statute not applied to marathon runner because entry

---

[5] Corwin also argues that the express language in the Release Agreement referencing GOL § 5-326 operates as an admission that negligence claims stemming from Citi Bike are not waivable and "is compelling proof of defendants' recognition that [the] waiver is void." ECF No. 361, Pl.'s Reply Mem. at 8. This is incorrect. Rather, the reference to GOL § 5-326 is plainly to ensure that the waiver provisions are not overbroad, putting users on notice that any such claims, *were they to exist*, would not be waived. It is not an admission that such claims *actually could* exist, or that in this case they *do* exist.

fee "was for his participation in the marathon, and was not an admission fee allowing him to use the City-owned public roadway over which the marathon was run" and "public roadway in Brooklyn where the plaintiff alleges he was injured is not a 'place of amusement or recreation'"); Tedesco v. Triborough Bridge & Tunnel Auth., 250 A.D.2d 758, 758 (2d Dep't 1998) (statute not applied to cyclist on paid bike tour "since the Verrazano Narrows Bridge, where the plaintiff . . . was injured, is not a 'place of amusement or recreation'"); Stuhlweissenburg v. Town of Orangetown, 223 A.D.2d 633, 634 (2d Dep't 1996) (statute not applied to accident occurring in softball game where no fee was paid to access field).

On the other hand, other courts have applied GOL § 5-326 to certain accidents on publicly accessible roadways, trails, or fields. See Williams v. City of Albany, 271 A.D.2d 855, 856–57 (3d Dep't 2000) (declining to follow Stuhlweissenburg and invalidating waiver for accident occurring in publicly accessible field for plaintiff playing in privately-operated flag football league); Filson v. Cold River Trail Rides, Inc., 242 A.D.2d 775, 777 (3d Dep't 1997) (invalidating waiver in horseback-riding accident guided by defendant but occurring on publicly accessible parkland); Wright v. Freeport Hudson Anglers, Inc., 2009 N.Y. Misc. LEXIS 4712 (Sup Ct. Nassau Cnty. Apr. 8, 2009) (invalidating waiver for sea accident occurring in fishing tournament).

In seeking to reconcile the case law, Defendants point out that every court to consider the applicability of GOL § 5-326 to an accident occurring on a public, paved, urban street has found the statute to be inapplicable. Corwin, for his part, argues that these cases are inapposite because the bike station was not part of a public road at all, but rather a separate "recreational facility" that happened to be located on a public road.[6]

---

[6] If true, this, of course, would contradict Corwin's argument that the Release Agreement is unenforceable as to the City because it purports to waive the City's non-delegable duty to maintain its roads.

Considering the case law and the legislative intent animating the statute, the Court finds as a matter of law that a Citi Bike station is not a "facility" for the purposes of § 5-326. The stations are plainly more properly characterized as storage facilities for bicycles rather than facilities for recreation in and of themselves. Even if riders incidentally enter or pass through the stations on their bicycles, or if the design of the particular bike station that was the site of the accident encouraged riders to pass through it, this does not turn them into "places of amusement or recreation." Assuming without deciding that Citi Bike is properly characterized as a primarily recreational program, the intended sites for that recreational use are the City's roadways and bike lanes—the very types of paved public thoroughfares that courts have held are not "places of amusement or recreation." See, e.g., Brookner, 51 A.D.3d at 842. Therefore, the station can only be defined in two ways: either it is part of the public road on which riders are meant to engage in recreational activity, or it is a storage facility that is not part of the roadway. Either way, it is not a "place of amusement or recreation" or "similar establishment," as required to trigger the statute. Accordingly, GOL § 5-326 cannot serve as a basis for invalidating the Release Agreement.

### iii. City's Common Law Duty to Maintain the Roads

New York courts have long held "that a municipality owe[s] to the public the absolute duty of keeping its streets in a reasonably safe condition." Friedman v. State, 67 N.Y.2d 271, 283 (1986) (quotations omitted); see also Wittorf v. City of New York., 23 N.Y.3d 473, 480 (2014) ("[A] municipality has a duty to maintain its roads and highways in a reasonably safe condition and liability will flow for injuries resulting from a breach of that duty."). As this duty has been characterized as "absolute" and "non-delegable" (though subject to the doctrine of qualified immunity, see infra Part IV), Corwin argues that the City's duty applies to the bike station and

25

wheel stop at issue and cannot be released by means of a private contract. The City contends that while it does indeed have a duty to maintain public roadways, a contractual waiver of this duty is permissible and would not offend any overarching public policy.

Before considering whether the City's duty to maintain public roadways may be released by contract to a voluntary participant in a public transportation program such as Citi Bike, the Court must first determine whether the Citi Bike station where Corwin's accident occurred properly falls within the scope of that duty. Indeed, defendants argue repeatedly that cyclists are not intended to use bike station areas as a travel lane, and that those facilities are intended only for the storage, retrieval, and return of bicycles. They contend that the presence of the concrete wheel stops and surrounding cross-hatching, white thermoplastic striping, and flexible delineators plainly distinguished the bike station from the adjoining roadway, and should have indicated to a cyclist that it was an area in which cycling was not permitted.

In determining the scope of a municipality's duty, New York courts have generally considered whether the municipality affirmatively undertook to provide an improved area adjacent to the road, such as a shoulder. If so, it has generally been held to be responsible for its maintenance. See Bottalico v. State, 59 N.Y.2d 302, 305 (1983) (finding highway shoulder to be within scope of duty because it was "both foreseeable and contemplated that, once provided, an improved shoulder at times will be driven upon"). The touchstone of this analysis is foreseeability. It does not necessarily depend on the reasonableness of a plaintiff's conduct. A municipality is required to "maintain the shoulder in a reasonably safe condition for foreseeable uses, including its use resulting from a driver's negligence." Id. at 304; see also Stiuso v. City of New York, 87 N.Y.2d 889, 891 (1995) (same); Saulpaugh v. State, 132 A.D.2d 781, 781–82 (4th Dep't 1987) (same).

On the other hand, no duty exists where a paved roadway "is more than adequate for safe public passage and travel beyond those limits is neither contemplated nor foreseeable." Tomassi v. Town of Union, 46 N.Y.2d 91, 97 (1978) (noting that "utility poles, drainage ditches, culverts, trees and shrubbery are often in close proximity to the traveled right of way . . . [b]ut for the careful driver, the placement of these items near the pavement creates no unreasonable danger"). The courts have repeatedly denied recovery for roadway users whose injury stemmed from the lack of maintenance of areas near the roadway whose use was unforeseeable even in emergencies. See, e.g., Preston v. State, 6 A.D.3d 835, 836 (3d Dep't 2004) (no recovery for driver hitting tree seven feet from the edge of the travel line, where "nothing in the record indicat[ed] that defendant affirmatively took any action to create or maintain the area"); Green v. Cty. of Allegany, 300 A.D.2d 1077, 1077 (4th Dep't 2002) (no recovery for failure to maintain drainage ditch and culvert headwall); Muller v. State, 240 A.D.2d 881, 882 (3d Dep't 1997) (no recovery for failure to maintain drainage ditch headwall beyond the traversable shoulder where the "emergency use of such additional area was neither contemplated nor foreseeable").

The record does not demonstrate that the City actively contemplated that cyclists would be passing through Citi Bike stations; indeed, precisely the alleged *failure* to contemplate this possibility forms the basis for Corwin's argument that the City is not entitled to qualified immunity on this issue. The Court does find, however, that the possibility of cyclists passing through Citi Bike stations located in on-street parking lanes was foreseeable. At times, defendants' representatives have seemed to admit that riding in the parking lane was, if not expressly permitted, at least a common practice of cyclists. ECF No. 335-24, Jon Orcutt 09/03/15 Depo. at 396–97. ("There are plenty of places with a wide parking lane . . . where a wide parking lane is kind of implemented as a stealth bike lane.") This conclusion is buttressed by a brief

traffic study conducted by Corwin's expert, James M. Green. ECF No. 335, Green Decl. ¶¶ 35, 57 (finding that cyclists regularly circulated through the station at issue and arguing that this was a "foreseeable consequence of this Station design," which was wider and jutted further out into the traffic lane). But even absent the expert's study, logic dictates that, just as an automobile is not generally permitted to drive on an improved shoulder but may swerve into it (negligently or not) in a situation where the circumstances so require, it is foreseeable that a cyclist such as Corwin may (negligently or not) enter into the Citi Bike station seeking safety when feeling pressured by tight traffic.

This is, perhaps, an imperfect analogy: whereas the express and primary purpose of an improved highway shoulder is to provide a safe outlet for motorists in emergency situations, this is not so for Citi Bike stations, whose primary purpose is the storage, retrieval, and return of bicycles. Nevertheless, the applicable case law does not require that the *primary purpose* of the improved space abutting the road be for such emergency uses; as stated above, foreseeability is sufficient to trigger the municipality's duty.  Nor have courts drawn distinctions between motorists and other roadway users; instead, they have found that cyclists may bring claims predicated on state or municipal government's failure to maintain roadways. See, e.g., Cotty v. Town of Southampton, 64 A.D.3d 251, 255 (2d Dep't 2009) (primary assumption of risk doctrine "not designed to relieve a municipality of its duty to maintain its roadways in a safe condition . . . and such a result does not become justifiable merely because the roadway happens to be in use by a person operating a bicycle"); Caraballo v. City of Yonkers, 54 A.D.3d 796, 796–97 (2d Dep't 2008) ("[T[he infant plaintiff cannot be said, as a matter of law, to have assumed the risk of being injured by a defective condition of a pothole on a public street, merely

because he was participating in the activity of recreational noncompetitive bicycling, and using the bicycle as a means of transportation." (citations omitted)).

Finally, there can be no question that the duty to maintain the roads applies not only to the physical condition of the road itself, but also to the placement of obstacles or hazards that make use of the road unsafe. Annino v. City of Utica, 276 N.Y. 192, 196–97 (1937) (municipality found liable for a tripod dangerously placed over a manhole cover so as to constitute a dangerous obstruction); Whitney v. Town of Ticonderoga, 127 N.Y. 40, 44 (1891) ("[T]he impairment of a highway for public use may be no less such by an obstruction placed in it than by a physical disturbance or injury to the bed of the roadway.").

Accordingly, the Court finds that the Citi Bike station, including all of its on-street equipment located in the parking lane, falls within the City's non-delegable duty to maintain the public roads. Therefore, the Court must now decide whether the City can waive this duty by contract as a condition of participating in the Citi Bike public transportation program.

"[E]ven an agreement that clearly and unambiguously attempts to exempt a party only from liability for ordinary negligence will not be enforced by the courts . . .  if it is found to violate public policy either by way of conflicting with an overriding public interest or because it constitutes an abuse of a special relationship between the parties, or both." Ash, 164 A.D.2d at 369. Indeed, when choosing to invalidate such clauses, courts have often analyzed the "public interest" and "special relationship" prongs together. See id. at 369–71 (invalidating exculpatory clause between dental clinic and patient both because of the public interest in protecting the welfare of its citizens and ensuring medical quality and the uniqueness of the physician-patient relationship); Conklin v. Canadian-Colonial Airways, Inc., 266 N.Y. 244, 247–48 (1935) (invalidating clause between common carrier and passenger because allowing public service

corporations to disclaim all liability for negligence by contract is contrary to public interest, and passengers are not typically given a choice in contracting); Johnston v. Fargo, 184 N.Y. 379, 384–85 (1906) (invalidating exculpatory clause between employer and employees both because of the state interest in the "maintenance of proper and reasonable safeguards to human life and limb" and the unequal bargaining power between the parties). On the other hand, courts have readily enforced exculpatory clauses in arm's length commercial transactions between two private parties, see, e.g., Florence v. Merchants Cent. Alarm Co., Inc., 51 N.Y.2d 793 (1980), when not expressly prohibited by statute.

No case has considered the specific question of whether a municipality's duty to keep its streets in a reasonably safe condition for travel can be waived by contract. For almost two centuries, however, New York state courts have spoken of an "absolute" duty that could not be delegated to third parties. See Annino, 276 N.Y. at 196 (1937) ("The city owed to the public the *absolute* duty of keeping its streets in a reasonably safe condition for travel and was bound to exercise reasonable care to accomplish that end.") (emphasis added) (citations omitted); Storrs v. City of Utica, 17 N.Y. 104, 108–09 (1858) (finding that municipal corporations "owe[] to the public the duty of keeping its streets in a safe condition for travel" and "although the work may be let out by contract, the corporation still remains charged with the care and control of the street in which the improvement is carried on . . . [and cannot] either avoid indictment in behalf of the public or its liability to individuals who are injured."). The only significant exception to this nondelegable duty is that "it is intended to protect the traveling public"—therefore, the duty has been held not to extend to injured employees of independent contractors working on road construction projects. Lopes v. Rostad, 45 N.Y.2d 617, 624–25 (1978). In reaching this

conclusion, the <u>Lopes</u> court stated that, because the government is responsible for providing the

public with roads and highways for travel:

> [w]ith this responsibility comes the further obligation to assure, insofar as is
> reasonably possible, that the thoroughfares of travel will be constructed and
> maintained in a safe condition. A governmental body would hardly have fulfilled
> its responsibility if the roadways it provided for public use were a source of public
> danger. It is for this reason that "[g]overnments have ever been most zealous to
> afford special protection to the users of streets, highways and other means of
> transportation" (1936 Report of NY, Law Rev Comm, p 955).

<u>Id.</u> at 625.

Corwin, a cyclist passing through a bike station located in a parking lane on a public

street, falls within the category of those deemed protected by a municipality's duty to maintain

its roadways. While it is certainly understandable that the City would seek to limit its exposure to

liability stemming from those using the Citi Bike program, its desire to see this salutary

transportation initiative succeed is not sufficiently related to the key, centuries-old public policy

of guaranteeing the safety of the users of City streets. It is this public policy that underlies its

non-delegable duty to keep streets and roadways safe. The City has designed a public

transportation system that involves physical installations in parking lanes on heavily transited

streets, and permitted a contractor, NYCBS, to implement and manage that program. Even

though the purported liability waiver is confined to road conditions in the circumscribed area of

the bike stations, the Court finds that the enforcement of such a waiver against over a million Citi

Bike users is contrary to the public policy that dictates that the City has the duty to guarantee

road safety.[7]

After all, the fact that Corwin was riding a Citi Bike, as opposed to his own bicycle, at

the time of his accident was purely coincidental. The City does not articulate any public policy in

---

[7] The waiver would certainly be effective as to claims unrelated to road conditions, such as, for example,
the quality of the bicycles or the malfunctioning of the rental kiosks.

barring Corwin's claim but permitting a claim brought by a non-member of Citi Bike who strikes the same wheel stop while riding his own bicycle. There is no basis for immunizing the City from suit by one class of cyclists—who participate in a highly publicized transportation program such as Citi Bike—while allowing non-Citi Bike users to bring suit for the same accident occurring in the same area of the street. Simply put, the law clearly imposes upon the City a duty to ensure road safety for *all* pedestrians, cyclists, motorists, and road users on *all* sections of the road that are foreseeably transitable.

At oral argument, counsel for the City indicated that the execution of transportation programs such as Citi Bike would not be feasible without such waivers of liability. But the City is not left wholly unprotected. As discussed in Parts IV and V of this opinion, the finder of fact may determine that the City is entitled to qualified immunity in regards to the station design, or that the City was not "affirmatively negligent" and is thus protected by the notice provisions of New York Administrative Code § 7-201. Therefore, the Court does not believe that its invalidation of the waiver as to road conditions and hazards within the bike stations threatens the viability of the Citi Bike program.

### D.      Conclusion

For the foregoing reasons, the Release Agreement effectively releases Corwin's common-law negligence claims against NYCBS, allowing only claims of gross negligence to proceed against it. The waiver does not apply to the City, however, because such a release of the City's duty would be contrary to public policy; accordingly, Corwin may proceed with his common-law negligence claims against the City. The Court need not decide if the APD is a "Released Person" under the Agreement, as it grants summary judgment to APD on all claims in Part VIII of this opinion on other grounds.

### III.    Affirmative Defenses Based on Corwin's Failure to Wear a Helmet

Defendants have set out various affirmative defenses—including comparative negligence, primary assumption of the risk, and failure to mitigate damages—premised on the uncontested fact that Corwin was not wearing a bicycle helmet at the time of the crash. Corwin moves for partial summary judgment on all of these defenses, arguing that there was no statutory obligation that he do so, that the City and NYCBS themselves represented that wearing a helmet was unnecessary, and that New York Vehicle and Traffic Law ("VTL") § 1238(7) and case law in New York and other jurisdictions expressly prohibits such conduct from being considered for the purposes of liability or damages.

As a preliminary matter, Corwin argues that defendants have failed to produce sufficient evidence to raise a factual question as to whether there was an unreasonable risk of a head injury while riding a Citi Bike without a helmet. Summary judgment is improper if "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party . . . ." Chambers, 43 F.3d at 37. There are disputed questions of material fact in this case as to both (a) whether a reasonably prudent person in Corwin's circumstances would have worn a helmet and (b) whether wearing such a helmet would have mitigated the damages Corwin suffered. See, e.g., ECF No. 344, Decl. of Elizabeth McCalley (arguing that Corwin would not have sustained many of his severe injuries had he worn a helmet).

There is no dispute that Corwin was not obligated to wear a helmet while riding a Citi Bike or any other bicycle; unlike the seatbelt requirements of N.Y. VTL § 1229-c, there is no statutory obligation for an adult bicyclist to wear a helmet while riding a bike on a public road.

33

N.Y. VTL § 1238(5) does require children under the age of fourteen to do so, but imposes no affirmative obligations on individuals over that age. A subsection of the same statute also indicates that "the failure of any person to comply with the provisions of this section shall not constitute contributory negligence or assumption of risk, and shall not in any way bar, preclude or foreclose an action for personal injury or wrongful death by or on behalf of such person, nor in any way diminish or reduce the damages recoverable in any such action." VTL § 1238(7); see also Lamica v. Precore, 273 A.D.2d 647, 647–48 (3d Dep't 2000) (in accident involving helmetless child on bicycle, dismissing defendants' counterclaim that parents were negligent for failing to ensure child wore helmet). Therefore, Corwin argues, if New York has seen fit to preclude expressly the consideration of helmet evidence for either liability or damages purposes even when wearing a helmet is mandated by law, surely the failure to wear a helmet by someone not obligated to do so by law should be similarly inadmissible.

The fact that New York has categorically barred the consideration of such evidence in a statute aimed at the protection of children does not, however, imply that the state has a general public policy against the admission of such evidence for all bicycle riders. Indeed, though Corwin argues that it would be "anomalous and irrational" to admit helmet evidence for an older rider under no legal obligation to wear a helmet, there is a clear and obvious rationale for the limited reach of the statute: a desire to prevent families from being burdened with costs stemming from accidents occurring on account of their young children's inability to perceive risks, and a determination that parents should not be found negligent for failing to ensure that their children wear helmets. No court has interpreted VTL § 1238(7) to stand for a general public policy that the failure to wear a helmet is inadmissible for purposes of measuring comparative negligence or mitigation of damages, and the Court declines to do so today.

While the New York Court of Appeals has not spoken authoritatively on the specific question of whether the non-use of a bicycle helmet is admissible under such circumstances, the framework that it adopted regarding the non-use of seat belts in automobiles is instructive. At a time when no law mandated that occupants of a passenger car wore seat belts, the court explicitly rejected the failure to wear a seat belt as a basis for contributory negligence[8] or primary assumption of the risk, but concluded that:

> nonuse of an available seat belt . . . is a factor which the jury may consider, in light of all the other facts received in evidence, in arriving at its determination as to whether the plaintiff has exercised due care, not only to avoid injury to himself, but to mitigate any injury he would likely sustain. However . . . the plaintiff's nonuse of an available seat belt should be strictly limited to the jury's determination of the plaintiff's damages and should not be considered by the triers of fact in resolving the issue of liability.

Spier v. Barker, 35 N.Y.2d 444, 449–50 (1974).

Therefore, in cases involving the failure to wear a seat belt, New York law imposes a pre-accident obligation to mitigate damages, and the burden of proving that the injured party failed to do so rests upon the defendant. Davis v. Davis, 49 A.D.2d 1024, 1024 (4th Dep't 1975). Lower New York courts have applied the same principles to other types of protective gear as well. See, e.g., Penzell v. State, 466 N.Y.S.2d 562, 567 (Ct. Cl. 1983) (motorcycle helmets); Gianetti v. Darling Delaware Carting Co., Inc., 666 N.Y.S.2d 372, 374–76 (Sup. Ct. Suffolk Cnty. 1997) (safety gloves in fast food restaurant). And, indeed, in the state court proceedings parallel to this case, the Appellate Division explicitly applied this reasoning to bicycle helmets, noting that "[Corwin's] failure to use a helmet is akin to a plaintiff's failure to use a seatbelt in a motor

---

[8] Though the Spier decision was rendered before New York's adoption of the comparative fault system and therefore discussed only if a plaintiff would be wholly barred from recovery under the then-existing doctrine of contributory negligence, New York courts have consistently considered seat belt evidence exclusively for purposes of mitigation of damages, and not for the apportionment of comparative fault. See, e.g., Stein v. Penatello, 185 A.D.2d 976, 976–77 (2d Dep't 1992).

vehicle case. It is well settled that any such failure does not go to comparative liability, but rather to how damages, if any, should be assessed." Corwin v. City of New York, 141 A.D.3d 484, 490 (1st Dep't 2016) (citation omitted).[9]

To be sure, some courts across the country have reached contrary conclusions.[10] See, e.g., Cordy v. Sherwin Williams Co., 975 F. Supp. 639, 647–48 (D.N.J. 1997) (noting that nothing in federal or state law alerts adult cyclists that their rights may be prejudiced by failure to wear a helmet, finding fewer safety concerns with helmetless biking and rejecting analogy to seat belt laws); Walden v. State, 818 P.2d 1190, 1196–97 (Mont. 1991) (holding same in state where evidence of seat belt use is inadmissible for mitigation of damages purposes). The decision in Corwin, however, and the logic of Spier and the New York cases extending it beyond the seat belt domain, compel denial of Corwin's motion for summary judgment as it pertains to the affirmative defenses relating to mitigation of damages.

Nevertheless, even as Spier and its progeny indicate that Corwin's non-use of a helmet will be admissible for the purposes of calculating damages, the cases also hold that such evidence is inadmissible on questions of liability. Therefore, defendants shall not be permitted to

---

[9] State courts in other jurisdictions have also drawn analogies between seat belt and helmet use. See, e.g., Stehlik v. Rhoads, 645 N.W.2d 889 (Wis. 2002) (same principles govern seat belt and helmet defenses for ATV rider); Meyer v. City of Des Moines, 475 N.W.2d 181, 186 (Iowa 1991) (same for moped rider); Warfel v. Cheney, 758 P.2d 1326 (Ariz. App. 1988) (same for motorcyclist).

[10] Corwin relies on Phelan v. State of New York, 11 Misc. 3d 151 (N.Y. Ct. Cl. 2005), where the New York Court of Claims declined to consider a bicyclist's non-use of a helmet in mitigation of damages. The case, however, is distinguishable as "no persuasive testimony, medical or otherwise, was proffered to establish that [plaintiff's] injuries would have been either avoided or reduced had she worn a helmet." Id. at 167. Therefore, the defendant failed to make even a prima facie case that damages should be mitigated by the decedent's failure to wear a helmet. To the extent that Phelan also based the decision on the fact the "[d]ecedent was not required to wear a helmet [by law]," this is inconsistent with the Appellate Division's decision in Corwin, 141 A.D.3d 484, and the logic of Spier v. Barker, 35 N.Y.2d 444.

argue that Corwin was comparatively negligent for failing to wear a helmet.[11] For the same reason and for the reasons expressed in Part VI of this Opinion, defendants will also not be permitted to argue that Corwin's claims are barred by the doctrine of primary assumption of risk. See also Cotty, 64 A.D.3d at 256 (2d Dep't 2009) ("[R]iding a bicycle on a paved public roadway normally does not constitute a sporting activity for purposes of applying the primary assumption of risk doctrine.").

Accordingly, Corwin's motion for summary judgment is DENIED as to the City's Seventh and Ninth affirmative defenses (ECF. No. 200), NYCBS's Sixth affirmative defense (ECF No. 199), and Metro Express's Sixth affirmative defense (ECF No. 213) concerning the relevance of his non-use of a helmet to mitigation of damages, and GRANTED as the City's Second and Eighth affirmative defenses, NYCBS's First and Seventh affirmative defenses and Metro Express's Second and Seventh affirmative defenses, inasmuch as those defenses assert the relevance of his non-use of a helmet to comparative negligence and assumption of the risk. Sealcoat did not explicitly reference Corwin's failure to use a helmet as an affirmative defense, (ECF No. 211) and in Part VIII, the Court grants summary judgment to APD and APDNY, thus rendering the question of summary judgment on their First affirmative defense moot.

## IV.   Qualified Immunity

### A.   City's Qualified Immunity for Bike Station Design and Wheel Stop Placement

The City of New York moves for summary judgment on the grounds that its involvement in the design and planning of the Citi Bike program is a uniquely governmental function for which it is entitled to qualified immunity as a matter of law. See Valdez v. City of New York, 18

---

[11] Of course, defendants may still argue at trial that Corwin was comparatively negligent for other reasons, including, inter alia, the speed, manner, and location of where he was riding his bicycle.

N.Y.3d 69, 76 (2011) ("Even if a plaintiff establishes all elements of a negligence claim, a state

or municipal defendant engaging in a governmental function can avoid liability if it . . . proves

that the alleged negligent act or omission involved the exercise of discretionary authority.").

   "When a negligence claim is asserted against a municipality, the first issue for a court to

decide is whether the municipal entity was engaged in a proprietary function or acted in a

governmental capacity at the time the claim arose." Applewhite v. Accuhealth, Inc., 21 N.Y.3d

420, 425 (2013). A municipality engages in governmental functions when its acts are

"undertaken for the protection and safety of the public pursuant to the general police powers,"

and in proprietary functions when "its activities essentially substitute for or supplement

traditionally private enterprises." Id. (citations omitted). If a municipality acts in a governmental

capacity, the plaintiff must prove that he was owed a special duty, and that the exercise of

governmental authority was not discretionary. Turturro v. City of New York, 28 N.Y.3d 469,

478–79 (2016).

   Traffic planning decisions, including decisions about the design of roads and other

facilities, are proprietary functions, arising from a municipality's "proprietary duty to keep its

roads and highways in a reasonably safe condition." Wittorf, 23 N.Y.3d at 480. This duty, while

"nondelegable . . . is measured by the courts with consideration given to the proper limits on

intrusion into the municipality's planning and decision-making functions." Friedman, 67 N.Y.2d

at 283 (internal quotation marks and citations omitted). As such, "in the specific proprietary field

of roadway safety, a municipality is afforded 'a qualified immunity from liability arising out of a

highway planning decision'" under certain circumstances. Turturro, 28 N.Y.3d at 479–80

(quoting Friedman, 67 N.Y.2d at 283)).

Such immunity arises only when the defendant can "demonstrate that a public planning body considered and passed upon the same question of risk as would go to a jury in the case at issue." Jackson v. N.Y. City Transit Auth., 30 A.D.3d 289, 290–91 (1st Dep't 2006) (finding general evaluation of buses referencing passengers' ability to grab onto overhead racks insufficient to grant qualified immunity on claim that transit authority should have installed grab bars and handholds); Leon v. N.Y. City Transit Auth., 96 A.D.3d 554, 554–55 (1st Dep't 2012) (denying qualified immunity for passenger injured by falling in gap between train car and platform when City had only studied the risk that train would scrape platform); see also Turturro, 28 N.Y.3d at 483 (no qualified immunity for City's failure to study speeding traffic on avenue); Poveromo v. Town of Cortlandt, 127 A.D.3d 835, 837 (2d Dep't 2015) (no qualified immunity for municipality's failure to install certain traffic devices at an intersection absent a study); Kuhland v. City of New York, 81 A.D.3d 786, 787 (2d Dep't 2011) (no qualified immunity for design of traffic intersection in absence of any pedestrian traffic studies); cf. Levi v. Kratovac, 35 A.D.3d 548, 549 (2d Dep't 2006) (qualified immunity granted for design of traffic intersection pursuant to a pedestrian safety study and reasonable traffic plan).

In light of these principles, the key question is whether the City's planning of the Citi Bike program "passed upon the same question of risk" that this case presents—namely, that the placement of unpainted concrete wheel stops within Citi Bike stations could pose a tripping danger to cyclists. The City describes a collaborative process between it and APD based on its experiences with "bike corrals" that employed similar features, including wheel stops. ECF No. 293, City St. ¶¶ 40–42, 50. The City indicates that it viewed wheel stops as "the most important safety feature that was also installed in 2011." Id. ¶ 46. Accordingly, the result of its collaboration with APD was a set of guidelines including the use of "non-permanent bollards,

wheel stops, and paint markings." Id. ¶ 55; ECF No. 289-19, 04/23/12 Station Siting Guidelines at 11. The City notes that APD and APDNY considered a wheel stop to be a necessary feature to protect the bike station from vehicles encroaching on the station and damaging the equipment or injuring individuals who may be within the station. City St. ¶ 58; ECF No. 289-3, Adrian Witte 08/14/15 Depo. at 20–21; ECF No. 289-5, Jeff Olson 09/29/15 Depo. at 410–11. The City did not, however, approve of the use of wheel stops that extend outside of the parking lane and into the travel lane. City St. ¶ 66; ECF No. 291, Sameer Barkho Decl. ¶ 10. The City determined that a yellow and black object marker, which had been included in the original design of some bike corrals, was "optional" because the on-street bike parking station sat in a parking lane and not a travel lane, and "pavement markings were more than sufficient to signal to an approaching motorist or bicyclist the presence of the on-street bike parking station and the presence of the wheel stop in the parking lane." Id. ¶ 11. On the contrary, wheel stops would be situated within a white painted rectangular box with "white paint markings forming diagonal lines within the rectangular box." Id. at ¶ 12.

The record plainly indicates that the decision to install concrete wheel stops in Citi Bike stations was the product of careful consideration and deliberation between the City and APD's design and engineering experts. This mere fact, however, does not suffice for the City to be entitled to qualified immunity as a matter of law. Corwin does not merely seek to have the fact finder "examine the criteria that were considered by the State's professional staff, emphasize factors allegedly overlooked, and, with the benefit of hindsight, rule that the studies were inadequate as a matter of law." Friedman, 67 N.Y.2d at 285–86. Rather, he argues that though the City considered the need and efficacy of wheel stop placement to prevent cars from encroaching into the stations and harming individuals or property, it conducted no studies

whatsoever as to whether such wheel stops could constitute tripping hazards for cyclists passing through such stations.

Though it is a close question, because the City has obviously given the coloring, placement, and demarcation of wheel stops some thought, the Court finds that there is a genuine dispute of material fact as to whether the City studied or "passed upon the same question of risk" presented in this case. While there is extensive testimony in the record that the City believed that wheel stops were of great importance in protecting stations from automobiles, the City has presented no specific study that suggests that it considered the effect of wheel stop placement or design on the safety of pedestrians or cyclists passing through the station, or whether the City considered that the wheel stops might be in the foreseeable paths of cyclists who, by custom or necessity, pass through the Citi Bike station footprints. In particular, it is not clear on what basis the City decided that object markers were to be made "optional," or if the City considered the adequacy of shorter wheel stops that would extend no further into the parking lane than the bikes themselves. Therefore, as a reasonable fact-finder could find that the City did not study or pass on the "same question of risk," the City is not entitled to qualified immunity as a matter of law on the specific question of wheel stop placement. At trial, the jury will be asked special interrogatories to resolve these disputed facts.

### B. City's Qualified Immunity for Failure to Provide Bicycle Helmets to Citi Bike Users

The City also moves for summary judgment on the basis of qualified immunity on Corwin's claims that "the intentional failure and refusal of the Defendants to design Citi Bike to include a convenient system of helmet rentals—as in place in Melbourne, Vancouver and Seattle—or otherwise provide helmets at all Citi Bike sites, was negligent . . . ." ECF No. 192, Second Am. Compl. ¶ 352.

The record plainly demonstrates that the City's decision not to mandate or provide helmets to Citi Bike users was the fruit of a well-reasoned policy based on extensive study of the "same question of risk as would go to a jury in the case at issue." Jackson, 30 A.D.3d at 290. As early as 2009, the City's Feasibility Study noted that "increasing the number of bicyclists is one of the most reliable ways to increase bicyclist safety," and cast doubt on the feasibility of helmet distribution. City St. ¶ 4; ECF No. 290-1, Bike Share Feasibility Study. The director of the City's Bike Share Unit stated that the City found that "mandatory helmet laws decreased bicycle ridership in general and decreased participation in bike share programs in particular. [The City] considered statistics showing that mandatory helmets laws actually decreased the safety of bicycling . . . [and] bicycle riders wearing helmets tend to ride more recklessly than riders who do not." ECF No. 290, John Frost Decl. ¶ 5. The City specifically noted that in Melbourne, Australia, mandatory helmet laws resulted in a lowered rate of bicycle usage. City St. ¶ 13; ECF No. 289-2, Kate Fillin-Yeh 08/20/15 Depo. at 46–48. The City also specifically considered installing automatic helmet rental machines and rejected the proposal on hygiene and structural integrity grounds in public comments justifying the policy choice. ECF No. 290, John Frost Decl. ¶ 6; ECF No. 289-1, Stephanie Levinsky-Shaw 08/12/15 Depo. at 222. Nevertheless, the City encouraged bicycle helmet use by distributing discount voucher coupons for the purchase of helmets to annual members and expanding helmet fitting and giveaway programs. ECF No. 290, Frost Decl. ¶ 7; ECF No. 289-2, Fillin-Yeh Depo. at 56, 60.

Contrary to Corwin's contentions, the fact that Defendants may raise the issue of his non-use of a helmet to prove a failure to mitigate damages does not affect the City's qualified immunity on this issue. Corwin will, of course, be free to demonstrate that his "conduct was not unreasonable under the circumstances and that he did not breach a duty of care because adults

are not required to wear helmets while riding bicycles in New York City and the Citi Bike

program does not provide helmets." <u>Corwin</u>, 141 A.D.3d at 495 (Andrias, J., dissenting). He may

not, however, seek to hold the City liable for what was a well-reasoned and studied

determination made in the public interest. <u>See</u> <u>Weiss v. Fote</u>, 7 N.Y.2d 579, 588 (1960)

("[C]ourts should not be permitted to review determinations of governmental planning bodies

under the guise of allowing them to be challenged in negligence suits."). Accordingly, the City is

granted summary judgment on Corwin's negligence claim regarding its failure to provide

helmets because it has qualified immunity on this issue.

## V.     New York City Administrative Code § 7-201

New York City Administrative Code § 7-201(c)(2) provides that:

> No civil action shall be maintained against the city for damage to property or
> injury to person or death sustained in consequence of any street . . . being out
> of repair, unsafe, dangerous or obstructed, unless it appears that written notice
> of the defective, unsafe, dangerous or obstructed condition, was actually given
> to the commissioner of transportation . . . or where there was previous injury to
> person or property as a result of the . . . condition, and written notice thereof
> was given to a city agency, or there was written acknowledgement from the city
> of the . . . condition, and there was a failure or neglect within fifteen days after
> the receipt of such notice to repair or remove the defect, danger or obstruction
> complained of, or the place otherwise made reasonably safe.

Popularly known as the "Pothole Law," the purpose of § 7-201(c)(2) is to prevent

municipal liability for "nonfeasance" and to limit it to cases where the municipality had actual

notice and opportunity to correct the hazardous condition. <u>Katz v. City of New York</u>, 87 N.Y.2d

241, 243 (1995). It is uncontested that the City did not have written notice of the installation of

the specific wheel stop at the Madison Avenue end of the Citi Bike station where the crash

occurred until after the accident, and that the drawing accompanying the permit does not show a

wheel stop at that location. City St. ¶¶ 107–12. City records do not demonstrate any written

complaints or claims of injury regarding a wheel stop at that location. <u>Id.</u> at ¶¶ 111–13.

There are, however, two exceptions to § 7-201(c)(2)—"that the municipality affirmatively created the defect through an act of negligence or that a special use resulted in a special benefit to the locality." Yarborough v. City of New York, 10 N.Y.3d 726, 728 (2008) (citation omitted).

Corwin does not merely allege that the City failed to remediate a dangerous condition created by a third party; indeed, his entire theory of liability is predicated on the premise that the City was affirmatively negligent in the design and placement of Citi Bike stations and wheel stops in the system as a whole. Additionally, he argues that the City was on notice of contractors' failures to install stations as per plan specifications and yet failed to monitor them effectively, and ultimately approved an identical policy of putting wheel stops on both ends of Citi Bike stations. ECF No. 335-33, NYC Comptroller Audit; ECF No. 336-25, Station Plan w/ 2 Wheel Stops. The City, for its part, notes that neither it nor NYCBS, with whom it had a contractual relationship, actually installed the wheel stop at issue; rather, it alleges that it was installed by Sealcoat, a contractor of MetroExpress, who itself was NYCBS's contractor. City St. ¶¶ 83–84.

The Court finds that there is a genuine dispute of material fact as to whether the City was affirmatively negligent so as to lose the written notice protections of § 7-201(c)(2). While Corwin cannot produce "smoking gun" evidence that the City affirmatively directed NYCBS or its agents to install the specific wheel stop in question, Corwin does provide evidence indicating that similar wheel stops were installed elsewhere in the City and that modifications to station plan installations were often done informally. See ECF No. 368-6 (10/30/2013 email from Dani Simons, NYCBS, to Stephanie Levitsky, DOT, stating "I do not know why [the wheel stop is] not in the drawings. I do know that [NYCBS directors] Hasib [Ikramullah] and Michael [Pellegrino] have both told me that we've started putting them on the cross-walk side of stations

in high traffic areas . . . ."); ECF No. 336-19 (07/01/2013 email from Stephanie Levinsky to Jon

Orcutt referencing "numerous on the fly modification[s]"); ECF No. 368-8 (May 15, 2013 email

from DOT to NYCBS referencing "supplemental street treatments" not on the initial plan

diagrams).

This evidence could lead a reasonable finder of fact to conclude that either the specific

wheel stop in question, or all wheel stops that enter into the foreseeable pathway of a cyclist,

were installed pursuant to affirmative acts of negligence by the City. The fact that the City had

no direct contractual relationship or knowledge of the involvement of Metro Express or Sealcoat

is not dispositive. Just as the City cannot delegate its duty to maintain the roads to a contractor, it

cannot do so to a subcontractor of that contractor.

Accordingly, the question of whether the affirmative negligence exception to the written

notice protections of § 7-201(c)(2) applies is a disputed question of fact to be resolved at trial,

and the City is not entitled to summary judgment because it was not provided notice of the

allegedly defective condition.[12]

## VI.   Primary Assumption of the Risk

The City, NYCBS, and APD also move for summary judgment on the grounds that the

doctrine of primary assumption of the risk bars Corwin's negligence claims. In voluntarily

undertaken recreational activities, the duty of a defendant is "to make the conditions as safe as

they appear to be. If the risks of the activity are fully comprehended or perfectly obvious,

plaintiff has consented to them and defendant has performed its duty." Turcotte v. Fell, 68

N.Y.2d 432, 439 (1986). In this case, the Release Agreement signed by Corwin contained

---

[12] Because the Court finds that the "affirmative negligence" exception may apply and because neither
party has adequately briefed the "special use resulting in a special benefit" exception to § 7-201(c)(2), the
Court declines to address the "special use" exception in this opinion.

explicit provisions on assumption of the risk, which state, *inter alia*, that "Member agrees that riding a Citi Bike bicycle involves many obvious and not-so-obvious risks, dangers, and hazards, which may result in injury or death . . . and that such risks, dangers, and hazards cannot always be predicted or avoided. Member agrees that such risks, dangers, and hazards are Member's sole responsibility." ECF No. 316-1, Release Agreement**.** Whether or not the broad assumption of the risk language is applicable depends on what courts consider to be the risks inherent in bicycling, recreational or otherwise, on a paved road in an urban environment.

The New York Court of Appeals has cautioned that the doctrine of assumption of risk is justifiable exclusively for its utility in "'facilitat[ing] free and vigorous participation in athletic activities'" and warned that the doctrine must be "closely circumscribed" and not "applied outside this limited context" lest it unduly displace the state's comparative negligence regime. Trupia v. Lake George Cent. Sch. Dist., 14 N.Y.3d 392, 395 (2010) (citing Benitez v. New York City Bd. of Educ., 73 N.Y.2d 650, 657 (1989)).[13] Accordingly, the assumption of the risk doctrine is not applicable to this case. "In determining whether a bicycle rider has subjected himself or herself to the doctrine of primary assumption of risk, we must consider whether the rider is engaged in a sporting activity, such that his or her consent to the dangers inherent in the activity may reasonably be inferred." Cotty, 64 A.D.3d at 255. Courts have consistently held that riding a bicycle on a paved road is not such a "sporting activity." The fact that an individual may be engaging in a recreational or leisure activity is not enough because the doctrine "is not designed to relieve a municipality of its duty to maintain its roadways in a safe condition." Id.;

---

[13] In its reply memorandum of law, NYCBS appears to characterize Trupia as permitting an open-ended "social benefit" analysis to determine whether the assumption of risk doctrine applies and discusses the numerous beneficial aspects of the Citi Bike program as a public transit system. Trupia, however, was limited to discussing the social benefit to certain *risky athletic activities* and explicitly warns against applying the doctrine in any other context. 14 N.Y.3d 392, 395.

see also Moore v. City of New York, 29 A.D.3d 751, 752 (2d Dep't 2006) (plaintiff did not assume risk of recreational cycling on paved park road); Vestal v. Cty. of Suffolk, 7 A.D.3d 613, 614–15 (2d Dep't 2004) ("[T]he injured plaintiff cannot be said as a matter of law to have assumed the risk of being injured as a result of a defective condition on a paved pathway merely because she participated in the activity of bicycling," even where County argued that the pathway was "abandoned").

        To be sure, courts have held that the doctrine of assumption of the risk applied in other contexts involving recreational cyclists. See, e.g., DeJesus v. City of New York, 29 A.D.3d 401, 402 (1st Dep't 2006) (plaintiff assumed risk for riding on pedestrian-only pathway in housing development); Chrem v. City of New York, 293 A.D.2d 301, 302 (1st Dep't 2002) (plaintiff assumed risk of steep drop-off in the back of a dirt mound not designated for cycling); Furgang v. Club Med, Inc., 299 A.D.2d 162, 162 (1st Dep't 2002) ("[T]he risk of encountering ruts and bumps while riding a bike over a rough roadway without a helmet is so obvious [that] as a matter of law, plaintiff assumed any risk inherent in the activity . . . ."); Goldberg v. Town of Hempstead, 289 A.D.2d 198, 198 (2d Dep't 2001) ("Since the risk of striking a hole and falling is an inherent risk in riding a bicycle on most outdoor surfaces, and the defective condition in this case was open and obvious, the infant plaintiff assumed the risk associated with riding her bicycle on the ballfield.") (citations omitted); Calise v. City of New York, 239 A.D.2d 378, 379 (2d Dep't 1997) (plaintiff assumed the risk of hitting an exposed tree root on unpaved path in public park). These cases, however, are readily distinguishable because they all involved individuals riding a bicycle on an unpaved path or other area plainly not designated for cycling. While defendants contend that the Citi Bike station was such an "undesignated" area, the station was obviously integrated into the public roadway, and Corwin has at the very least raised a

genuine dispute of material fact as to whether the design of this station compelled or encouraged him to ride through it to avoid riding dangerously close to traffic. Therefore, his brief passage through the parking lane and bike station cannot be analogized to a considered decision to engage in recreational mountain biking or to ride down an undesignated pedestrian walkway.

 Accordingly, the doctrine of primary assumption of the risk is unavailable, and defendants are not entitled to summary judgment on this theory.

## VII.   "Open and Obvious"

A defendant has "no duty to protect or warn against an open and obvious condition which is not inherently dangerous." Stern v. River Manor Care Ctr., Inc., 106 A.D.3d 990, 990 (2d Dep't 2013). Whether a condition was open and obvious is generally a question of fact inappropriate for summary judgment and "depends on the totality of the specific facts of each case." Russo v. Home Goods, Inc., 119 A.D.3d 924, 925–26 (2d Dep't 2014). Nevertheless, "a court may determine that a risk was open and obvious as a matter of law when the established facts compel that conclusion . . . ." Tagle v. Jakob, 97 N.Y.2d 165, 169 (2001). Defendants contend that Corwin's claims fail as a matter of law because the concrete wheel stop, located in a striped white box with "zebra" cross-hatching underneath and surrounded by four three-foot-tall flexible delineators, was "open and obvious."

Defendants' claims are buttressed by cases holding that wheel stops located in parking lots or similar environments were sufficiently "open and obvious" so as to bar claims by injured pedestrians. See, e.g., May v. Ruby Tuesday, Inc., No. 13-CV-170 (FJS)(ATB), 2014 WL 4966544, at *5–6 (N.D.N.Y. Oct. 2, 2014) (parking lot wheel stop open and obvious especially given plaintiff's admission that she had previously seen it); Abraido v. 2001 Marcus Ave, LLC, 126 A.D.3d 571, 571–72 (1st Dep't 2015) (wheel stop in well-lit parking lot open and obvious);

Bellini v. Gypsy Magic Enters., Inc., 112 A.D.3d 867, 868 (2d Dep't 2013) (parking lot wheel stop open and obvious when plaintiff admitted she was attempting to step over it); Wachspress v. Cent. Parking Sys. of New York, Inc., 111 A.D.3d 499, 499–50 (1st Dep't 2013) (parking lot wheel stop open and obvious); Zimkind v. Costco Wholesale Corp., 12 A.D.3d 593, 593–94 (2d Dep't 2004) (same).

Whether or not a potential hazard is readily visible to the naked eye is evidently an important consideration in determining whether it is open and obvious, but it does not definitively resolve the question because "[t]he nature or location of some hazards, while they are technically visible, make them likely to be overlooked." Westbrook v. WR Activities-Cabrera Mkts., 5 A.D.3d 69, 72 (1st Dep't 2004). On at least two occasions, New York courts, considering the broader context of plaintiffs' encounter with wheel stops, declined to find that they were "open and obvious." In Rivera v. Queens Ballpark Co., LLC, 134 A.D.3d 796, 797–98 (2d Dep't 2015), the court found that a concrete wheel stop that began in a designated parking space but partially extended into and obstructed a pedestrian walkway was not "open and obvious" as a matter of law. Similarly, in O'Leary v. Saugerties Cent. Sch. Dist., 277 A.D.2d 662, 662 (3d Dep't 2000), a plaintiff who tripped over a concrete parking lot wheel stop raised a triable issue of fact by arguing that it was undetectable and camouflaged by cars parked bumper-to-bumper.

Were the Court to view the wheel stop, cross-hatching, and delineators in isolation, it would be hard-pressed to distinguish them from the conspicuous parking lot wheel stops that New York courts have found to be "open and obvious" as a matter of law. Notwithstanding Corwin's argument that the wheel stop was "camouflaged" because it was not painted in a bright color that would contrast it with its surroundings, photographic evidence submitted by both

Corwin and defendants suggests to the Court that it would have been readily visible to an observant pedestrian. Nevertheless, the types of obstacles that a pedestrian might expect to encounter in a parking lot are substantially different from those that a cyclist would expect in an on-street bike station. Therefore, the Court finds that Corwin has raised a genuine issue of material fact as to whether the wheel stop was open and obvious to an attentive person in his position—that is, a cyclist traveling within a station that arguably invited use as a bike lane.

The declaration of James M. Green, Corwin's engineering expert, brings forth various issues relevant in this analysis. First, Green alleges that the Citi Bike station in question was wider than the specifications required, presenting Corwin with the "choice of continuing through the bike parking facility, or turning out into traffic, with only approximately 0.75 feet between [him] and moving vehicular traffic." ECF No. 335, Green Decl. ¶ 56**.** An hour-long traffic study conducted by Green found that "cyclists circulate through the [Citi Bike] station with regularity" and that this was a "foreseeable consequence of this Station design." Id. ¶¶ 35, 57. Green therefore argues that the wheel stop, though in a parking lane, was placed within the foreseeable path of a cyclist. Id. ¶ 46. He further concluded that various factors, including the wheel stop's partial obscuring by parked bicycles, its lack of contrast against the grey asphalt, and a cyclist's need simultaneously to pay attention to dynamic vehicular and pedestrian traffic, would have made the wheel stop inconspicuous, not "open and obvious." Id. ¶¶ 48–49.

In determining whether summary judgment is appropriate, the Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. See Scott, 550 U.S. at 378. Drawing all inferences in his favor, Corwin has distinguished the cases that feature garden-variety wheel stops in parking lots. Similar to the scenario in Rivera, 134 A.D.3d at 797, where the court did not find that a wheel stop was open and obvious

as a matter of law when it partially obstructed a pedestrian walkway, there is a genuine dispute of material fact as to whether the wheel stop hazardously obstructed a path that was foreseeably and actually utilized by cyclists.

Accordingly, defendants are not entitled to summary judgment on the grounds that the wheel stop that caused Corwin's accident was "open and obvious."

## VIII.   Claims against Alta Planning + Design, Inc. and Alta Planning + Design + Architecture of New York, PLLC

Alta Planning + Design, Inc. and Alta Planning + Design + Architecture of New York, PLLC (collectively, "APD"), the architects and designers for the Citi Bike project who collaborated with the City to generate site plans for stations, move for summary judgment on Corwin's claims of common law, gross, and professional negligence. APD notes that the key elements of the station that Corwin alleges caused his crash—primarily, the installation of the additional wheel stop at the east end of the station and the increased width of the station footprint—were installed in violation of its approved design. Corwin alleges that, even if APD did not recommend the installation of the specific wheel stop, their recommendation of unpainted concrete wheel stops throughout the Citi Bike system, and wheel stops' placement within the foreseeable path of cyclists passing through stations were substantial factors in his accident. The Court need not resolve this dispute, however, because it finds that, regardless of the propriety of its recommendations to the City, APD did not owe a duty of care to Corwin under Espinal v. Melville Snow Contractors, Inc., 98 N.Y.2d 136 (2002).

It is uncontested that, as an architecture firm, APD did not have any contractual obligations to install, inspect, or maintain Citi Bike stations and, therefore, could not be liable to Corwin under any theory dependent on its control of Citi Bike stations or wheel stops. See Gibbs v. Port Auth. of New York, 17 A.D.3d 252, 254 (1st Dep't 2005) ("Liability for a dangerous

condition on property may only be predicated upon occupancy, ownership, control or special use

of such premises . . . ."). It is similarly clear that APD had no direct contractual obligation to

Corwin. Therefore, any duty to Corwin would necessarily flow out of APD's contractual

obligation to Alta Bicycle Share/NYCBS. "In the ordinary case, a contractual obligation,

standing alone, will impose a duty only in favor of the promisee and intended third-party

beneficiaries." Eaves Brooks Costume Co. v. Y.B.H. Realty Corp., 76 N.Y.2d 220, 226 (1990);

see also H.R. Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 168 (1928) (Cardozo, J.) (noting

that a contrary holding would imply that a contracting party would be forced into "the

involuntary assumption of a series of new relations, inescapably hooked together").

In Espinal, the New York Court of Appeals, synthesizing decades of case law, announced

three exceptions to the general principle that contracting parties do not owe a duty of care to

third persons. These exceptions are:

> (1) where the contracting party, in failing to exercise reasonable care in the
> performance of his duties, 'launche[s] a force or instrument of harm' (Moch, 247
> N.Y. at 168); (2) where the plaintiff detrimentally relies on the continued
> performance of the contracting party's duties (see Eaves Brooks, 76 N.Y.2d at
> 226) and (3) where the contracting party has entirely displaced the other party's
> duty to maintain the premises safely (see Palka v. Servicemaster Mgmt. Servs.
> Corp., 83 N.Y.2d 579, 589 (1994)).

Espinal, 98 N.Y.2d at 140.

Corwin could not have relied on APD's continuing performance under its contract with

Alta Bicycle Share/NYCBS because APD had no such obligations except submitting site plans,

and it had no effect on the duty of the other defendants to maintain the bike stations safely.

Therefore, the only Espinal exception that arguably applies is that APD "launched a force or

instrument of harm" with its allegedly negligent site plans and recommendations for wheel stop

placements. This standard is met where "the promisor, while engaged affirmatively in

discharging a contractual obligation, creates an unreasonable risk of harm to others, or increases that risk." Church v. Callanan Indus., Inc., 99 N.Y.2d 104, 111 (2002); see also Guzman v. Wackenhut Corp., 394 F. App'x 801, 803 (2d Cir. 2010) (summary order).

On these facts, accepting the argument that providing allegedly negligent design advice and site plans is sufficient to "launch a force or instrument of harm" would lead to the very limitless expansion of tort liability that New York law seeks to prevent. Moch Co., 247 N.Y. at 165 (Cardozo, J.) ("An intention to assume an obligation of indefinite extension to every member of the public is seen to be the more improbable when we recall the crushing burden that the obligation would impose."). Indeed, Corwin's argument is that APD's negligence consists not of specific malfeasance relating to the design of the Citi Bike station where his accident occurred,[14] but its general negligence in approving the type, appearance, and placement of wheel stops throughout the Citi Bike system. The logical conclusion of this argument is that by providing services to Alta Bicycle Share/NYCBS, APD would be subjecting itself to potential tort liability to literally millions of potential plaintiffs who could be involved in an accident involving wheel stops in any one of hundreds of Citi Bike stations—even as it had no responsibility for the maintenance or installation of the allegedly hazardous obstructions.[15] This is not the law as summarized in Espinal.

---

[14] Indeed, as APD argues, the Citi Bike station at issue in this case did not conform to its plan at all. See ECF No. 321-30, APD Expert Report. Corwin's own expert would seem to agree. In a rebuttal report, James M. Green contended that "the original Engineering design [presented by APD] was proper in minimizing the clearance behind the parked bicycles and leaving out a wheel stop at the [relevant] intersection and was not followed during the construction of the bike station." ECF No. 321-24, Green 01/06/16 Rebuttal Report at 9.

[15] Corwin's evidence that APD actually had some responsibility for the installation of Citi Bike stations, which appears to consist of a single May 22, 2013 email from APD engineer Adrian Witte referring the installation of station "bridging" (ECF No. 336-28), and deposition testimony references to the "collaborative" process between APD, NYCBS, and the City (ECF No. 335-6. Jeff Olson 08/26/15 Depo. at ¶¶ 401–02, 484, 530), is insufficient to raise a genuine dispute of material fact about APD's lack of responsibility over Citi Bike stations.

Finally, Corwin argues that APD was an alter ego of Alta Bicycle Share/NYCBS because APD served as the parent company over Alta Bicycle Share before its sale in 2014. ECF No. 192, Second Am. Compl. ¶ 16. "It is well-settled that the party seeking to pierce the corporate veil has the burden of establishing that there is a basis to do so." Maggio v. Becca Constr. Co., 229 A.D.2d 426, 427 (2d Dep't 1996) (citations omitted). Notwithstanding the close relationship between APD and Alta Bicycle Share/NYCBS, and their former association, Corwin has failed to establish that APD is anything but a legitimate and separate business entity engaging in planning and design. "Those seeking to pierce a corporate veil of course bear a heavy burden of showing that the corporation was dominated as to the transaction attacked and that such domination was the instrument of fraud or otherwise resulted in wrongful or inequitable consequences. . . . An inference of abuse does not arise . . . where a corporation was formed for legal purposes or is engaged in legitimate business." TNS Holdings, Inc. v. MKI Sec. Corp., 92 N.Y.2d 335, 339–40 (1998); see also Joseph Kali Corp. v. A. Goldner, Inc., 49 A.D.3d 397, 398–99 (1st Dep't 2008) (refusing to pierce corporate veil between two entities operated by same principal). On the record before it, the Court sees no conceivable equitable reason to disregard the corporate form in this case.

As the Court concludes that APD did not owe any duty to Corwin under Espinal, it need not consider APD's alternate arguments regarding proximate causation and its defense that Corwin's claim arose out of a deviation from its design. The Court GRANTS APD's motion for summary judgment in its entirety.

## IX.   Claims against Metro Express Services, Inc. and Sealcoat USA, Inc.

Defendants Metro Express Services, Inc. and Sealcoat USA, Inc. ("Metro Express" and "Sealcoat," respectively), third-party contractors who are alleged to have installed or sub-

contracted the installation of the specific wheel stop that caused Corwin's injuries, move for summary judgment, arguing that they did not owe Corwin a duty of care under Espinal, 98 N.Y.2d 136 (2002), and that the wheel stop is an open and obvious condition as a matter of law. Having already rejected the "open and obvious" argument in Part VII of this opinion, the Court considers whether Metro Express and Sealcoat had a duty to Corwin under one of the three Espinal exceptions discussed in Part VIII.

As was true for APD, there is no argument that Corwin "detrimentally relie[d] on the continued performance of the contracting party's duties" or that Metro Express or Sealcoat "entirely displaced the other party's duty to maintain the premises safely." Id. at 140. Detrimental reliance becomes a consideration only when there is some form of continued contractual performance by the third-party contractor and is not relevant when the alleged negligent conduct concerns a one-time installation of station equipment (even if the contractor may have installed said equipment in many stations). And there is no evidence in the record that Metro Express or Sealcoat assumed any responsibilities, much less exclusive responsibilities, for the maintenance and safety of Citi Bike facilities.

Therefore, the only issue is whether there is a genuine dispute of material fact that Metro Express or Sealcoat "launch[ed] a force or instrument of harm." Corwin contends that the wheel stop on the east side of the Citi Bike station was an "instrument of harm," and a contractor negligently responsible for its installation could be found liable under Espinal. To be sure, "[a] builder or contractor is justified in relying upon the plans and specifications which he has contracted to follow unless they are so apparently defective that an ordinary builder of ordinary prudence would be put upon notice that the work was dangerous and likely to cause injury." Ryan v. Feeney & Sheehan Bldg. Co., 239 N.Y. 43, 46 (1924). There are, however, genuine

disputes of material fact as to whether the contractors installed the wheel stop in question and whether they did so pursuant to a plan provided them by NYCBS.

Citing ambiguities in emails received from NYCBS, Metro Express contends that a full installation of street treatments was never ordered for the Citi Bike station at issue, and in fact NYCBS only ordered Metro Express and Sealcoat to carry out repairs. ECF No. 366, Metro Express Reply Mem. at 3–4. Metro Express further notes that Sealcoat reported that there was nothing wrong with the station and never invoiced or received payment for any work. Id. at 5. Finally, it contends that Metro Express was never provided with a plan for the Station, and that NYCBS had been instructing Metro Express to install "supplemental street treatments" not depicted on the station plans, noting two specific instances in which they were ordered to do so in stations at Jay Street and Tech Place, and Charles Street and Greenwich Ave. Id. at 7–9.

While Metro Express and Sealcoat certainly raise issues of fact about their liability, there is sufficient information in the record to preclude a finding that they are entitled to judgment as a matter of law. For example, in addition to NYCBS's allegations that Metro Express and Sealcoat were responsible for the installation, Ryan Landeck, Sealcoat Vice President, admitted in non-party deposition testimony in 2015 that Sealcoat had installed the wheel stop in question under Metro Express's direction. ECF No. 289-10, Landeck 11/19/15 Depo. at 34, 45.[16]

Accordingly, the Court concludes that, unlike APD, there is a material dispute whether Metro Express and/or Sealcoat "launched a force or instrument of harm" if plaintiffs prove at trial that they negligently installed the wheel stop at the East 56th Street and Madison Avenue

---

[16] Mr. Landeck later testified at a deposition that took place after Sealcoat was joined in the case that Sealcoat found that there was nothing to do be done at that location and Sealcoat did not invoice or receive payment for its alleged work at the station. ECF No. 368-3, Landeck 05/25/2016 Depo. at 51, 55. An October 23, 2013 email from Landeck to Michael Strasser, General Manager at Metro Express, further stated that "nothing was wrong at this station." ECF No. 368-4.

Citi Bike station in contravention of the site plan and the directions received from NYCBS.

Unlike the case for APD, who provided general designs for hundreds of Citi Bike stations, there

is no danger of an undue ballooning of tort liability because the contractors would be liable only

for their own negligence and have an absolute defense if they can demonstrate that they were

carrying out a pre-existing plan. Cf. In re World Trade Ctr. Lower Manhattan Disaster Site Litig.,

44 F. Supp. 3d 409, 430 (S.D.N.Y. 2014) (finding that Espinal and Moch stood for "the general

public policy that courts will not impose a tort duty on a contracting party where doing so would

expose the party to potentially unlimited and undefined liability" and finding a duty where there

was "no risk of . . . boundless tort liability").

Therefore, because the Court finds that a question of fact exists regarding whether Metro

Express and/or Sealcoat "launched a force or instrument of harm," Metro Express and Sealcoat's

motions for summary judgment are DENIED.

**X.     Gross Negligence Claims**

Given that Corwin's common-law negligence claims against NYCBS are barred by the

enforceability of the Release Agreement as discussed in Part II of the opinion, NYCBS moves

for summary judgment on the grounds that Corwin's gross negligence claims fail as a matter of

law.[17]

Under New York law, gross negligence is "conduct that evinces a reckless disregard for

the rights of others or 'smacks' of intentional wrongdoing." Am. Tel. & Tel. Co. v. City of New

York, 83 F.3d 549, 556 (2d Cir. 1996) (quoting Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs.,

Ltd., 81 N.Y.2d 821, 823–24 (1993)). "[T]he act or omission must be of an aggravated character,

as distinguished from the failure to exercise ordinary care." Curley v. AMR Corp., 153 F.3d 5,

---

[17] The City has also moved for summary judgment on this point; however, the Court has found that Corwin's common-law negligence claims may proceed as to the City.

13 (2d Cir. 1998). "In order to establish a prima facie case in gross negligence, a plaintiff 'must prove by a fair preponderance of the credible evidence' that the defendant 'not only acted carelessly in making a mistake, but that it was so extremely careless that it was equivalent to recklessness.'" Travelers Indem. Co. of Connecticut v. Losco Grp., Inc., 204 F. Supp. 2d 639, 644 (S.D.N.Y. 2002) (quoting Hong Kong Exp. Credit Ins. Corp. v. Dun & Bradstreet, 414 F. Supp. 153, 160 (S.D.N.Y. 1975)).

Drawing all reasonable inferences in favor of Corwin, the nonmoving party, summary judgment is not appropriate on Corwin's gross negligence claims. If, as argued by Corwin's expert James M. Green, NYCBS is proven at trial to have unjustifiably ignored sound engineering practices and placed camouflaged wheel stops in the direct and foreseeable paths of cyclists, a reasonable factfinder could conclude that their conduct was sufficiently reckless and/or aggravated to meet the gross negligence standard. The defendants' motion for summary judgment on Corwin's gross negligence claims is therefore denied.

## CONCLUSION

Corwin's motion for summary judgment on defendants' affirmative defenses relying on the Release Agreement is GRANTED as to the City and DENIED as to NYCBS. Corwin's motion for summary judgment on defendants' affirmative defenses relating to his non-use of a helmet is GRANTED in part; defendants may not argue that this is relevant to questions of liability to establish comparative negligence or assumption of the risk, but if liability is found, may argue that Corwin failed to mitigate damages. The City's motion for summary judgment is DENIED. NYCBS's motion for summary judgment is GRANTED in part; because the Court finds that the Release Agreement is enforceable, Corwin's common-law negligence and professional negligence and malpractice claims are dismissed, but he may still maintain gross

negligence claims. APD's motion for summary judgment is GRANTED. Metro Express and

Sealcoat's motions for summary judgment are DENIED.

      The Clerk of Court is respectfully directed to terminate Dkt. Nos. 288, 295, 303, 304,

309, and 314 and terminate defendants Alta Planning + Design, Inc. and Alta Planning Design

Architecture of New York, PLLC from the case.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED:     New York, New York
            March 1, 2017